# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **The National Organization for Marriage**, and **American Principles In Action** <br> *Plaintiffs*, <br><br> *v.* <br><br> **Walter F. McKee, Andre G. Duchette, Michael P. Friedman, Francis C. Marsano**, and **Edward M. Youngblood**, all in their official capacity as members of the Commission on Governmental Ethics and Election Practices; **Matthew Dunlap**, in his official capacity as Secretary of State of the State of Maine; **Mark Lawrence, Stephanie Anderson, Norman Croteau, Evert Fowle, R. Christopher Almy, Geoffrey Rushlau, Michael E. Povich**, and **Neal T. Adams**, all in their official capacity as District Attorneys of the State of Maine; and **Janet T. Mills**, in her official capacity as Attorney General of the State of Maine, <br> *Defendants*. | Civil Cause No._____ |

# Verified Complaint for Declaratory and Injunctive Relief
## (INJUNCTIVE RELIEF SOUGHT)

Come now Plaintiffs the National Organization for Marriage ("NOM"), and American Principles In Action ("APIA"), and for their Complaint against the Defendants, state the following:

1.     This is a civil action for declaratory and injunctive relief arising under the First and Fourteenth Amendments to the Constitution of the United States. This case concerns the constitutionality of Maine's ballot question committee ("BQC") registration statute, codified in

Maine Revised Statutes Annotated ("M.R.S.A."), Title 21-A § 1056-B.

**2.**      Plaintiffs complain that 21-A M.R.S.A. § 1056-B is unconstitutional in that it infringes protected First Amendment speech and freedom of association and is not narrowly tailored to serve a compelling state interest.

## Jurisdiction

**3.**      This action arises under Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, 42 U.S.C. § 1983, and the First and Fourteenth Amendments to the Constitution of the United States.

**4.**      The jurisdiction of this Court over the claims arising under 42 U.S.C. § 1983 is founded upon 28 U.S.C. § 1343(a). The jurisdiction of the claims arising under the First and Fourteenth Amendments is founded upon 28 U.S.C. §§ 1331 and 1343(a).

**5.**      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b). The defendants are officers, employees or agents of the State of Maine.

## Parties

**6.**      Plaintiff NOM is a nonprofit 26 U.S.C. § 501(c)(4) issue advocacy corporation incorporated in Virginia dedicated to preserving the traditional definition of marriage.

**7.**      Plaintiff APIA is a nonprofit 26 U.S.C. § 501(c)(4) issue advocacy organization incorporated in the District of Columbia dedicated to promoting equality of opportunity and ordered liberty.

**8.**      Defendants Walter F. McKee, Andre G. Duchette, Michael P. Friedman, Francis C. Marsano, and Edward M. Youngblood are all residents of Maine and are members of the Commission on Governmental Ethics and Election Practices (the "Commission"). The

Commission is charged under 21-A M.R.S.A. §§ 1003 and 1127 with the enforcement of the provisions of Chapters 13 and 14, respectively, of Title 21-A. The Defendants are sued in their official capacity and are subject to the jurisdiction of this Court.

9.    Defendant Matthew Dunlap is a resident of Maine and serves as the Secretary of State. The Secretary of State is charged with enforcing Maine's election laws pursuant to 21-A M.R.S.A. §§ 1003 and 1062-A. He is sued in his official capacity.

10.    Defendant Janet T. Mills is a resident of the State of Maine and serves as Attorney General. The Attorney General is charged with enforcing Maine's election laws pursuant to 21-A M.R.S.A. §§ 33, 1003, and 1062-A. She is sued in her official capacity.

11.    Defendants Mark Lawrence, Stephanie Anderson, Norman Croteau, Evert Fowle, R. Christopher Almy, Geoffrey Rushlau, Michael E. Povich, and Neal T. Adams are residents of the State of Maine and serve as District Attorneys throughout the State. District Attorneys are charged with enforcing Maine's election laws pursuant to 21-A M.R.S.A. § 33, 30-A M.R.S.A. §§ 282 and 283. Each is sued in his or her official capacity.

**Regulatory Scheme**

12.    21-A M.R.S.A. § 1056-B, which provides as follows:

Any person not defined as a political action committee who solicits and receives contributions or makes expenditures, other than by contribution to a political action committee, aggregating in excess of $5,000 for the purpose of initiating, promoting, defeating or influencing in any way a ballot question must file reports with the commission in accordance with this section. Within 7 days of receiving contributions or making expenditures that exceed $5,000, the person shall register with the commission as a ballot question committee. For the purposes of this section, expenditures include paid staff time spent for the purpose of influencing in any way a ballot question. The commission must prescribe forms for the registration, and the forms must include specification of a treasurer for the committee, any other principal officers and all individuals who are the primary fund-raisers and decision makers for the committee. In

the case of municipal election, the registration and reports must be filed with the clerk of that municipality.

    **13.**    A "person" is defined by 21-A M.R.S.A. § 1001 as "an individual, committee, firm, partnership, corporation, association, group or organization."

    **14.**    For purposes of the $5,000 threshold requirement, "contribution" "includes, but is not limited to":

    A.    Funds that the contributor specified were given in connection with a ballot question;

    B.    Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating, promoting, defeating or influencing in any way a ballot question;

    C.    Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating, promoting, defeating or influencing in any way a ballot question when viewed in the context of the contribution and the recipient's activities regarding a ballot question; and

    D.    Funds or transfers from the general treasury of an organization filing a ballot question report.

21-A M.R.S.A. § 1056-B(2-A)

    **15.**    21-A M.R.S.A. § 1056-B(1) further requires that "A report required by this section must be filed with the commission according to the reporting schedule in section 1059."

    **16.**    Reports required for BQCs:

must contain an itemized account of each expenditure made to and contribution received from a single source aggregating in excess of $100 in any election; the date of each contribution; the date and purpose of each expenditure; and the name and address of each contributor, payee or creditor; and the occupation and principal place of business, if any, for any person who has made contributions exceeding $100 in the aggregate. The filer is required to report only those contributions made to the filer for the purpose of initiating, promoting, defeating or influencing in any way a ballot question and only those expenditures made for those purposes.

21-A M.R.S.A. § 1056-B(2).

17.    The BQC registration form makes clear that a report must be filed at registration, and that a BQC must report "all contributions and expenditures" including "expenditures such as those associated with the collection of signatures, paid staff time, travel reimbursement, and fundraising expenses." Commission on Governmental Ethics and Election Practices, *Registration: Ballot Question Committees: For Persons and Organizations Other Than PACs Involved in Ballot Question Elections* (Exhibit 7.) The registration form requires the personal information of a "Treasurer," "Principal Officer[s]," "Primary Fundraisers and Decision Makers," and requires a "Statement of Support or Opposition," indicating "whether the committee supports or opposes a candidate, political committee, referendum, initiated petition or campaign." (Exhibit 7.)

18.    21-A M.R.S.A. § 1056-B(4) provides that "[a] person filing a report required by this section shall keep records as required by this section for 4 years following the election to which the records pertain." BQCs must also "keep a detailed account of all contributions made to the filer for the purpose of initiating, promoting, defeating or influencing in any way a ballot question and all expenditures made for those purposes," and "retain a vendor invoice or receipt stating the particular goods or services purchased for every expenditure in excess of $50."

19.    The failure to register as required under 21-A M.R.S.A. § 1056-B is punishable by a $250 fine. 21-A M.R.S.A. § 1062-A(1).

20.    The failure to file reports as required by 21-A M.R.S.A. § 1056-B or 1059 is punishable by a maximum fine of $10,000. 21-A M.R.S.A. § 1062-A(4).

21.    Further, "[a] person who fails to file a report as required by this subchapter within 30 days of the filing deadline is guilty of a Class E Crime." 21-A M.R.S.A. § 1062-A(8).

**Facts**

22.     On May 6, 2009, Governor John Baldacci signed into law legislation recognizing same-sex marriage in Maine. On May 7, 2009, opponents of the measure submitted the required paperwork necessary to launch a "people's veto" campaign, which would leave the matter to be decided via statewide referendum.

23.     Plaintiff NOM is a nonprofit 26 U.S.C. § 501(c)(4) issue advocacy corporation dedicated to preserving the traditional definition of marriage. NOM is a national organization active in all fifty states.

24.     NOM solicits and receives most of its funds as undesignated donations from major donors and national organizations. The remainder of its funds are received primarily as undesignated donations from direct mail solicitations. NOM's projected budget for 2009 is $7 million.

25.     NOM does not have as its major purpose the promotion or defeat of any Maine referendum or ballot question.

26.     On May 6, 2009, NOM distributed an email update to subscribers focused on a proposed referendum in Maine that would overturn then pending legislation in Maine regarding same-sex marriage. The May 6th email stated: "Your support today will allow us to start the referendum process immediately when the law is signed, ensuring that the measure does not take effect before the people of Maine have had their say. Can you afford a gift of $35, $50 or $100 today to help stop same-sex marriage not just in Maine, but in New Hampshire, Iowa, and other states as well?" (Exhibit 5, at 2-3.) NOM estimates that it received approximately $2,469 in donations as a result of the May 6th email.

VERIFIED COMPLAINT                              6

27.     On May 8, 2009, NOM distributed an email update to subscribers describing

efforts to enact same-sex marriage in the District of Columbia, Maine, and New Hampshire.

After describing events in Maine, the email also stated: "<u>You can fight back! Can you help</u>

<u>defend marriage in Maine and across the country, by donating $5, $10, or even, if God has given</u>

<u>you the means, $100 or $500?</u>" (Exhibit 5, at 4) (Emphasis in original.) NOM estimates that it

received approximately $1,055 in donations as a result of the May 8th email.

28.     On May 15, 2009, NOM distributed an email update to subscribers. The email

focused on events relating to same-sex marriage in New York and New Hampshire, but

contained a sentence stating: "We will fight to be your voice in New Hampshire, Maine (more on

that next week), Iowa, New York, New Jersey, D.C. and all across this great and God-blessed

country of ours." (Exhibit 5, at 7.)

29.     On May 22, 2009, NOM distributed an email update to subscribers. The email

focused on events relating to same-sex marriage in New Hampshire, New York, and

Massachusetts, but contained a sentence stating "I'm back in Maine today    we'll keep you

updated on progress in building the coalition to push back gay marriage in Maine. We will need

your help   <u>all the help you can spare</u>!" (Exhibit 5, at 8-9) (Emphasis in original.) NOM

estimates that it received approximately $285 in donations as a result of the May 22nd email.

30.     On June 12, 2009, NOM distributed an email update to subscribers focused on

events relating to same-sex marriage in New York. The email also includes a paragraph regarding

Maine, stating: "[i]n Maine, I've joined the board of the new coalition to fight to overturn the gay

marriage law. It's called StandforMarriageMaine.com. If you live in Maine, go there right now

and find out how you can sign a petition, or collect signatures to get marriage on the ballot this

November . . . I was up in Maine this week and the signature gathering effort is gathering great steam." (Exhibit 5, at 11.) The June 12th also asked "[t]o help us in Maine and all 50 states, can you make a monthly donation?" (Exhibit 5, at 11.)

31.     On July 8, 2009, NOM distributed an email update to subscribers describing the efforts of Stand for Marriage Maine, a registered Maine PAC, to overturn recently enacted Maine same-sex marriage legislation via referendum. The email asked readers to "[m]ake an online donation at StandforMarriageMaine.com." (Exhibit 5, at 13.)

32.     On July 10, 2009, NOM distributed an email update to subscribers describing efforts to overturn recently enacted Maine same-sex marriage legislation via referendum. The email also stated that "[t]he National Organization for Marriage worked hard with StandforMarriageMaine to make this happen. But it could not have happened without your help! You are the ones who made this happen... and we need you to help secure this victory: Can you help us with $10, 25, or $100 so that Maine   and our country   can recover the true meaning or marriage?" (Exhibit 5, at 14) (Emphasis in original.) NOM estimates that it received approximately $350 in donations as a result of the July 10th email.

33.     On July 17, 2009, NOM distributed an email update to subscribers. The email focused mainly on events related to same-sex marriage in the District of Columbia, but with a brief description of recent events in Maine. NOM estimates that it received approximately $40 in donations as a result of the July 17th email.

34.     On July 31, 2009, NOM distributed an email update to subscribers focused on events related to same-sex marriage in Maine, and mentioned that "StandforMarriageMaine.com has turned in an extraordinary 100,000 signatures to overturn gay marriage." (Exhibit 5, at 20.)

**VERIFIED COMPLAINT**                    8

NOM estimates that it received approximately $255 in donations as a result of the July 31st email.

35.     On August 7, 2009, NOM distributed an email update to subscribers describing the efforts to overturn recently enacted Maine same-sex marriage legislation via referendum. The email asked readers to "[v]isit StandforMarriageMaine.com today to make your contribution in the fight to protect marriage in Maine!" (Exhibit 5, at 23) (Emphasis in original.) The email also added that readers could "[u]se this hyperlink to help support NOM's work not only in Maine but around the country, wherever the need arises." (Exhibit 5, at 23) (Emphasis in original.) NOM estimates that it received approximately $60 in donations as a result of the August 7th email.

36.     On August 26, 2009, NOM distributed an email update to subscribers focused on events related to same-sex marriage in New Jersey and New York. The email included one reference to a Maine resident, but otherwise did not discuss the Maine referendum.

37.     On August 28, 2009, NOM distributed an email update to subscribers describing a recent article on NOM executive director Brian Brown and focusing on events related to same-sex marriage in Iowa. One sentence in the email stated "Help us fight to protect marriage in Iowa, Maine and everywhere across this great land    donate today!" (Exhibit 5, at 28) (Emphasis in original.) NOM estimates that it received approximately $395 in donations as a result of the August 28th email.

38.     On September 4, 2009, NOM distributed an email update to subscribers update. This email stated that "Marriage is now officially on the ballot in Maine this November" and twice urged readers to donate to Stand for Marriage Maine. (Exhibit 5, at 30.)

39.     Each of the above listed emails contained a hyperlinked "Donate" button which

**VERIFIED COMPLAINT**                                   9

sent potential donors to the donations screen at http://www.nationformarriage.org. The donation

screen at http://www.nationformarriage.org provides that "[n]o funds will be earmarked or

reserved for any political purpose."

40.　　In July of 2009, NOM distributed newsletter to subscribers. One of the articles in

this newsletter described NOM's participation in the Maine same-sex marriage referendum

effort, and stated: "Your support of NOM is critical to the success of this effort." The newsletter

also included a donation card and return envelope for donations to NOM. (Exhibit 6, at 4.)

41.　　On August 13, and 24, 2009, the Commission received email correspondence

from Fred Karger of Californians Against Hate, alleging that NOM, as well as several other

organizations, was engaged in "money laundering" by contributing to Stand for Marriage Maine

PAC. (Exhibits 9, 10.)

42.　　On October 1, 2009, the Commission conducted a preliminary fact gathering

regarding Mr. Karger's allegations. While the Commission took no action at this meeting

regarding Mr. Karger's specific allegations, the Commission did decide to authorize its staff to

conduct an investigation regarding whether NOM had violated Section 1056-B by failing to

register as a BQC, with a suggested scope for the investigation to be outlined at a future meeting

of the Commission. (Exhibit 11.)

43.　　Depending on which, if any, of the donations for the above listed emails and

newsletters are considered "contributions" for purposes of section 1056-B, NOM is either near or

has already exceeded the $5,000 threshold for ballot question committee status.

44.　　NOM intends to distribute further emails and newsletters mentioning Maine and

soliciting donations, which will exceed $5,000, both during the current election cycle and in

future elections. However, NOM fears enforcement under section 1056-B based on any such future activities, as well as for activities already engaged in.

45.     Plaintiff APIA is a nonprofit 26 U.S.C. § 501(c)(4) organization dedicated to promoting equality of opportunity and ordered liberty.

46.     APIA does not have as its major purpose the promotion or defeat of any Maine referendum or ballot question.

47.     APIA intends to produce a 30 second video entitled "Bigot" relating to same-sex marriage in Maine and place it on its website. The script for the ad is as follows:

Girl: Mommy, are you a bigot?

Mother: What?

Girl: At school, we learned that people who are against gay marriage are bigots.

Mother: No, dear.  I believe that homosexuals should be treated fairly--but I also believe that marriage should be just for one man and one woman.  That doesn't make me a bigot.

Girl: What about Reverend Jones and Father Diego?  Are they bigots?

Mother: Did you learn that at school too?

*Girl nods*

VO: Think that gay marriage won't affect your family?  Think again.

*Vote Yes Graphic*

48.     APIA also intends to produce a 30 second video entitled "The New Curriculum" relating to same-sex marriage in Maine and place it on its website. The script for the ad is as follows:

School Administrator (*talking to an off-camera mic/reporter--as he talks, we see images*

**VERIFIED COMPLAINT**                                11

*of teachers in classrooms reading from blurred-out books, GLSEN-style posters, etc.*): No, we're very proud of the new curriculum.  It's all about teaching kids to embrace different lifestyles and explore their own sexuality.

*Switching from images of sex ed classrooms to little boy on a bench in a darkened school hallway.  We can see an adult male (not his face, we're looking from the perspective of the child and the view never includes  his head) come out of an office, take the boy's hand, lead him into the office, and close the door.  Freeze on the closed door, which has a sign that says, "Counseling Session: Do Not Disturb"*

Reporter (VO) : Yes, but is it appropriate for kindergartners to be receiving counseling about whether they might be gay?

School Admin (VO): Sure, we've had a few complaints, but there's not much parents can do.  It's the law, after all.

VO: Think gay marriage won't affect your family? Think again.

*Vote Yes Graphic*

**49.**     APIA estimates that the total cost of producing "Bigot" and "The New Curriculum" and placing them on its website is approximately $3,000.

**50.**     APIA intends to buy television time in Maine to air "Bigot" and "The New Curriculum." APIA is chilled from doing so, however, by the prospect of having to register as a BQC and meet the reporting and other requirements of sections 1056-B and 1059.

**51.**     Further, APIA intends to solicit donations in order to defray the cost of producing and airing "Bigot" and "The New Curriculum," as well as other expenses, both during the current election cycle and in future elections. However, APIA fears that in doing so it will be deemed a

**VERIFIED COMPLAINT**                          12

BQC under Section 1056-B, and will be subject to the reporting and other requirements of sections 1056-B and 1059.

52.     Immediate and irreparable injury, loss, and damage will result to Plaintiffs by reason of the regulation's chilling effect on Plaintiffs' free speech and associational rights and by the potential for enforcement of Section 1056-B against NOM and APIA.

53.     Plaintiffs have no adequate remedy at law.

<b>Count I</b>

**Section 1056-B is Unconstitutional Facially and As Applied to Plaintiffs, in That It Imposes Burdensome Registration and Reporting Requirements on Individuals and Organizations Based on Ballot Measure Advocacy.**

54.     Plaintiffs reallege the preceding paragraphs.

55.     Section 1056-B imposes substantial organizational and conduct burdens on individuals and organizations which qualify as a BQC. Individuals and organizations falling under Section 1056-B must undergo registration, must appoint a treasurer, must use a designated account, must keep detailed records for four years, must report contributions and expenditures at prescribed intervals, and must disclose information about persons making contributions over $100.

56.     "[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976). In addition, "reporting and disclosure requirements are more burdensome for multi-purpose organizations . . . than for political action committees whose sole purpose is political advocacy." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1101 n.16 (9th Cir. 2003).

57.     Because Section 1056-B imposes substantial burdens on political speech and

association, it is subject to strict scrutiny. *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 256 (1986).

58.     The Supreme Court has held that three governmental interests may justify campaign disclosure laws if the regulations are narrowly tailored to serve those interests. *See Buckley*, 424 U.S. at 66-68. First, "disclosure provides the electorate with information as to where the political campaign money comes from and how it is spent by the candidate." *Id.* at 66. This information alerts voters to the "interests to which a candidate is most likely to be responsive." *Id.* at 67. Second, disclosure can deter actual corruption and avoid the appearance thereof. *Id.* Lastly, disclosure requirements are an essential "means of gathering the data necessary to detect violations of [contribution limits]." *Id.* at 68.

59.     However, *Buckley* involved candidate elections, and the Supreme Court has since clarified that the Corruption Interest is simply not present in the context of ballot measure elections. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) ("Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue."); *see also Emily's List v. Federal Election Com'n*, 2009 WL 2972412 *12 (D.C. Cir. Sep. 18, 2009) ("Donations to and spending by a non-profit cannot corrupt a candidate or officeholder."); *Volle v. Webster*, 69 F. Supp.2d 171, 175 n.7 (D. Me. 1999).

60.     The enforcement interest is likewise not applicable in the context of ballot measure elections because Maine lacks contribution limits with respect to ballot measures. *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1032 (9th Cir. 2009) (*citing McConnell v. FEC*, 540 U.S. 93, 196 (2003)).

VERIFIED COMPLAINT                              14

61.     The Supreme Court has held that one-time reporting of independent expenditures

is a less restrictive means of achieving the state's legitimate informational interest than imposing

the "full panoply of regulations that accompany status as a political committee." *Massachusetts*

*Citizens for Life*, 479 U.S. at 262; *see also Volle v. Webster*, 69 F. Supp. 2d 171, 176 (holding

that by imposing "the full panoply of registration and reporting requirements that *Buckley I*

examined under the Federal Election Campaign Act . . . Maine's registration statute goes

considerably beyond what is permitted and is therefore unconstitutional.")

62.     Because Section 1056-B would subject NOM and APIA to the "full panoply of

registration and reporting requirements" rather than the less restrictive means of one-time

disclosure of expenditures, the provision is unconstitutional both facially and as applied to NOM

and APIA.

### Count II
**Section 1056-B is Unconstitutional Facially and As Applied to Plaintiffs, in That It Imposes Burdensome Registration and Reporting Requirements on Individuals and Organizations That Do Not Have Ballot Measure Advocacy As Their Major Purpose.**

63.     Plaintiffs reallege the preceding paragraphs.

64.     Section 1056-B imposes substantial organizational and conduct burdens on

individuals and organizations which qualify as a BQC. Individuals and organizations falling

under Section 1056-B must undergo registration, must appoint a treasurer, must use a designated

account, must keep detailed records for four years, must report contributions and expenditures at

prescribed intervals, and must disclose information about persons making contributions over

$100.

65.     The right of association is a "basic constitutional freedom" that is "closely allied

to freedom of speech and a right which, like free speech lies at the foundation of a free society."

*Buckley v. Valeo*, 424 U.S. 1, 25 (1976).

66.     To protect that right and to assure that registration requirements did not chill core

First Amendment speech, the *Buckley* Court promulgated its "major purpose" to determine

whether a particular group must suffer the burden of registering and reporting as a political

committee under federal election law.

67.     That test, in the context of political speech regarding candidates, provides that an

organization is a political committee only if it is 'under the control of a candidate or the major

purpose of which is the nomination or election of a candidate." *Id*. at 79.

68.     Similarly, in the case of a political organization that does not have as its major

purpose the initiation, promotion or defeat of a ballot measure, a registration requirement which

ignores the "major purpose" of an organization unconstitutionally chills political speech. *See id.*

at 75-80.

69.     21-A M.R.S.A. § 1056-B requires individuals and organizations to register as a

BQC without regard to whether the major purpose of the individual or organization is the passage

or defeat of a ballot measure.

70.     Neither NOM nor APIA has as its major purpose the initiation, promotion or

defeat of a ballot measure.

71.     Because Section 1056-B would subject NOM and APIA to burdensome

registration and reporting requirements without regard to whether they have as their major

purpose the initiation, promotion or defeat of a ballot measure, the provision is unconstitutional

both facially and as applied to Plaintiffs.

**Count III**
**Section 1056-B's Definition of "Contribution" is Unconstitutional Facially and As Applied to Plaintiffs, in That It is Unconstitutionally Vague and Overbroad.**

**72.**     Plaintiffs reallege the preceding paragraphs.

**73.**     The definition of "contribution" in 21-A M.R.S.A. § 1056-B(2-A) includes: (1) "Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating, promoting, defeating or influencing in any way a ballot question"; and (2) "Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating, promoting, defeating or influencing in any way a ballot question when viewed in the context of the contribution and the recipient's activities regarding a ballot question."

**74.**     The vagueness doctrine bars enforcement of a statute whose terms are "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *U.S. v. Councilman*, 418 F.3d 67, 84 (1st Cir. 2005) (*quoting U.S. v. Lanier*, 520 U.S. 259, 264 (1997).

**75.**     NOM and APIA have and would like to solicit donations to support their activities. But neither can know whether those solicitations could be interpreted to result in "contributions" that trigger BQC status.

**76.**     A statute will be facially invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *McCullen v. Coakley*, 571 F.3d 167, 182 (1st Cir. 2009) (*quoting Washington State Grange v. Washington State Republican Party*, 128 S.Ct. 1184, 1191 n.6 (2008)).

77.     A person's right to freedom of speech cannot be contingent on the reaction to, or interpretation of, that speech by third parties. As the Supreme Court noted in *Buckley*, making the legitimacy of speech turn on the interpretation of third parties is problematic, as it "puts the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning. [This] offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim." *Buckley*, 424 U.S. at 43.

78.     By counting towards the $5,000 threshold solicitations for donations that "lead the contributor to believe" donations will be used for ballot measure activity, Section 1056-B potentially imposes burdensome registration and reporting requirements on NOM and APIA based on how others interpret and/or react to their speech. For this reason, the definition of "contribution" in Section 1056-B is substantially overbroad.

**Count IV**
**Section 1056-B is Unconstitutional Facially and As Applied to Plaintiffs, in That Its $100 Reporting Requirement Fails Strict Scrutiny.**

79.     Plaintiffs reallege the preceding paragraphs.

80.     Reports required for BQC "must contain an itemized account of each expenditure made to and contribution received from a single source aggregating in excess of $100 in any election," as well as contributor information "for any person who has made contributions exceeding $100 in the aggregate." BQCs are required "to report only those contributions made to the filer for the purpose of initiating, promoting, defeating or influencing in any way a ballot question and only those expenditures made for those purposes." 21-A M.R.S.A. § 1056-B(2).

81.     In *Buckley*, the Supreme Court held that any significant encroachment on First

Amendment rights must survive exacting scrutiny, which requires the government to craft a narrowly tailored law to serve a compelling government interest. *See Buckley*, 424 U.S. at 64.

      **82.**    The $100 threshold reporting requirement is not narrowly tailored to the state's interest in avoiding corruption, as this interest does not apply in the ballot measure context. *Bellotti*, 435 U.S. at 790.

      **83.**    Further, Section 1056-B is not narrowly tailored to the state's informational interest in disclosure, as it requires reporting for contributions and expenditures so low as to give no meaningful information to voters. *Canyon Ferry*, 556 F.3d at 1033. Voters gain little, if any, information from the disclosure of small donors. *Id.* at 1036 (Noonan, J., concurring) ("How do the names of small contributors affect anyone else's vote? Does any voter exclaim, 'Hank Jones gave $76 to this cause. I must be against it!'")

      **84.**    Since the $100 reporting threshold of Section 1056-B is not narrowly tailored to any compelling government interest, the provision is unconstitutional facially and as applied to NOM and APIA.

      WHEREFORE, Plaintiffs pray this court to:

            (1) Declare 21-A M.R.S.A. § 1056-B unconstitutional facially and as applied to Plaintiffs as a violation of the First Amendment right to engage in political speech;

            (2) Prohibit, by way of permanent injunction, the Defendants, their agents, and successors from enforcing 21-A M.R.S.A. § 1056-B against NOM and APIA; and

            (3) Grant NOM and APIA costs and attorney's fees under 42 U.S.C. § 1988 and any other applicable authority.

/s/ Stephen C. Whiting
Stephen C. Whiting, Maine # 559
THE WHITING LAW FIRM
75 Pearl Street, Suite 207
Portland, ME 04101
Ph: (207) 780-0681
*Local Counsel for Plaintiffs*

James Bopp, Jr., Ind. #2838-84
Jeffrey Gallant, Vir. #46876
Josiah Neeley, Tex. #24046514
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/234-3685 facsimile
*Lead Counsel for Plaintiffs*

## VERIFICATION

I SWEAR (OR AFFIRM) UNDER THE PENALTIES FOR PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING STATEMENTS CONCERNING THE NATIONAL ORGANIZATION FOR MARRIAGE FOUND IN THIS COMPLAINT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND UNDERSTANDING.

Dated: this 19th day of October, 2009.

Brian S. Brown
Executive Director
National Organization for Marriage
20 Nassau Street, Suite 242
Princeton, NJ 08542
609/688/0450 telephone
609/688/0455 facsimile

## VERIFICATION

I SWEAR (OR AFFIRM) UNDER THE PENALTIES FOR PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING STATEMENTS CONCERNING AMERICAN PRINCIPLES IN ACTION FOUND IN THIS COMPLAINT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND UNDERSTANDING.

Dated: this 20th day of October, 2009.

Andresen Blom
Executive Director
American Principles Project
1100 H Street, NW
Suite 700
Washington, DC 20005
202-347-6840
202-347-6849 - fax