## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **NATIONAL ORGANIZATION FOR MARRIAGE AND AMERICAN PRINCIPLES IN ACTION,** | ) ) ) ) | |
| **PLAINTIFFS** | ) ) | |
| **v.** | ) ) | **CIVIL NO. 09-538-B-H** |
| **WALTER F. McKEE,** *in his official capacity as member of the Commission on Government Ethics and Election Practices*, **ET AL.,** | ) ) ) ) ) | |
| **DEFENDANTS** | ) | |

## DECISION AND ORDER ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

This case assesses Maine's attempt to strike the proper balance between the right to free expression enshrined in the First Amendment and Maine's interest in having its voters informed as they make their decisions at the polls this November (or earlier, if they vote absentee) on a particular ballot initiative.

### INTRODUCTION

Under Maine law, any person or entity that solicits and receives contributions or makes expenditures over $5,000 "for the purpose of initiating, promoting, defeating or influencing in any way a ballot question" must register and file reports with the Maine Commission on Governmental Ethics and Election Practices. Maine's November 3 ballot asks Maine voters to decide whether to veto a recent Maine statute that permits gay marriage. The plaintiffs here are two

nonprofit corporations that operate nationwide. One describes itself as "dedicated to preserving the traditional definition of marriage," and says that it has been receiving contributions connected in part to the Maine November 3 election. The other says that it is "dedicated to promoting equality of opportunity and ordered liberty," and that it proposes to make expenditures in connection with television commercials about the Maine ballot question. State election officials recently have begun an investigation of one of the two plaintiff nonprofits to determine whether it has illegally failed to register and report. As a result, the plaintiffs have filed this lawsuit against a variety of state officials, asking me to declare that the First Amendment makes the Maine registration and reporting statute unconstitutional. They have asked for the emergency relief of a temporary restraining order against enforcement because the election is imminent, and they wish to make solicitations and expenditures that exceed the $5,000 threshold without registering or reporting. I conducted an expedited hearing on Monday, October 26, 2009.

The critical question on a request for a temporary restraining order is the likelihood of success on the merits. Notably for First Amendment purposes, the challenged Maine statute does not limit contributions or expenditures in connection with ballot initiatives. Instead, it requires that they be reported when they exceed a certain threshold. Although these requirements impose some burden on the plaintiffs in pursuing their First Amendment rights of association and speech, Maine has a very strong interest in providing its voters with information about the source of the money that funds the campaign on either side of a ballot issue. To achieve that goal, it imposes only a minimal burden on

2

persons or entities that contribute money or make expenditures.  I conclude that the plaintiffs have failed to show a likelihood of success on their claim that the Maine statute violates the First Amendment.  I therefore **DENY** the motion for a temporary restraining order.[1]  The case will proceed in the ordinary course.

### SUMMARY OF MAINE ELECTION LAWS FOR BALLOT INITIATIVES

According to § 1056-B of Maine's election statute, "any person not defined as a political action committee who receives contributions or makes expenditures, other than by contribution to a political action committee, aggregating in excess of $5,000 for the purpose of initiating, promoting, defeating or influencing in any way a ballot question must" register as a Ballot Question Committee with the Maine Commission on Governmental Ethics and Election Practices (the "Commission") and file reports with the Commission.[2]  A "contribution" includes:

A.   Funds that the contributor specified were given in connection with a ballot question;

B.   Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating, promoting, defeating or influencing in any way a ballot question;

C.   Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating, promoting, defeating or influencing in any way a ballot

---

[1] At oral argument, the plaintiffs agreed that the scheduling of the TRO hearing had granted their motion for expedited relief and that no further action on that motion is necessary.

[2] 21-A M.R.S.A. § 1056-B.  A "person" is defined as "an individual, committee, firm, partnership, *(continued on next page)*

> question when viewed in the context of the contribution and
> the recipient's activities regarding a ballot question; and
>
> D.    Funds or transfers from the general treasury of an organization
> filing a ballot question report.[3]

The registration form requires the Ballot Question Committee to name its "Treasurer," "Principal Officer," "Primary Fundraisers and Decision Makers," and requires a "Statement of Support or Opposition," indicating "whether the committee supports or opposes a candidate, political committee, referendum, initiated petition or campaign."[4]  The registration form also instructs that a report must be filed at registration, and that a Ballot Question Committee must report "all contributions and expenditures" including "expenditures such as those associated with the collection of signatures, paid staff time, travel reimbursement, and fundraising expenses."[5]  Thereafter, Ballot Question Committees must file quarterly reports according to the statute's regular schedule for reporting,[6] listing the name, mailing address, occupation and employer[7] of any "contributor" donating more than $100.[8]  The report also requires the documentation of all expenditures "to support or oppose" made to "a single payee or creditor aggregating in excess of $100," identified according to categories provided by the

---

corporation, association, group or organization."  21-A 1 M.R.S.A. § 1001.

[3] 21-A M.R.S.A. § 1056-B(2-A).

[4] Registration: Ballot Question Committees: For Persons and Organizations Other Than PACs Involved in Ballot Question Elections (Ex. 7 to Verified Compl. (Docket Item 1)).

[5] Id.

[6] 21-A M.R.S.A. § 1059.

[7] The report requires the listing of employer whereas the statute makes reference to the "principal place of business."  21-A M.R.S.A. § 1056-B(2).

[8] 2009 Campaign Finance Report – Ballot Question Committees: For Persons and Organizations Involved in Ballot Question Elections (Other Than PACs) (Ex. 8 to Verified Compl.).

Commission, with "remarks" for "expenditures" for "Campaign consultants," "Professional services," and those reported as "Other."[9]  Records must be kept for four years, and Ballot Question Committees must "keep a detailed account of all contributions made to the filer for the purpose of initiating, promoting, defeating or influencing in any way a ballot question and all expenditures made for those purposes" and "retain a vendor invoice or receipt stating the particular goods or services purchased for every expenditure in excess of $50."[10]

The failure to register as required under § 1056-B is punishable by a $250 fine.[11]  The failure to make the initial registration, or file the required reports, is punishable by a maximum fine of $10,000.[12]  A person who fails to file a report as required within 30 days of the filing deadline is guilty of a Class E Crime.[13]

**FACTS**

For purposes of this preliminary motion only, the parties have agreed that I should accept as true the allegations of the plaintiffs' verified complaint and the defendants' affidavit.

The National Organization for Marriage ("NOM") is a nonprofit 501(c)(4)[14] issue advocacy corporation incorporated in Virginia.  It is dedicated to preserving the traditional definition of marriage.[15]  Between May 6, 2009 and September 4,

---

[9] Id.
[10] 21-A M.R.S.A. § 1056-B(4).
[11] 21-A M.R.S.A. § 1062-A(1).
[12] 21-A M.R.S.A. § 1062-A(4).
[13] 21-A M.R.S.A. § 1062-A(8).  The State may not, however, prosecute a violation of the filing requirements if the Committee has assessed and collected a penalty.  See 21-A M.R.S.A. § 1062-A(8-A).
[14] 501(c)(4) refers to a provision of the Internal Revenue Code denoting the type of non-profit organization.
[15] Verified Compl. ¶ 6.

2009, NOM distributed e-mails to its subscribers discussing efforts to oppose same-sex marriage in various states, including Maine.[16]  Each of the e-mails contained a hyperlinked "Donate" button which sent potential donors to the donations screen at a website.[17]  The donations screen at the website stated that "[n]o funds will be earmarked or reserved for any political purpose."[18]  In addition, the July 2009 newsletter that NOM distributed to its subscribers included an article that described NOM's efforts to preserve the traditional definition of marriage in Maine. It stated: "Your support of NOM is critical to the success of this effort."[19]  The newsletter included a contribution card and return envelope for donations to NOM.[20]  NOM says that it has received at least $4,909 in donations as a result of the e-mails soliciting support for repealing the Maine law.[21]

American Principles In Action ("APIA") is a nonprofit 501(c)(4) issue advocacy organization incorporated in the District of Columbia.[22]  It is dedicated to promoting equality of opportunity and ordered liberty.[23]  APIA has filmed two short video advertisements opposing same-sex marriage in Maine, at a cost of approximately $3,000.[24]  APIA intends to buy television time in Maine to air these advertisements before the November ballot, and to solicit donations for this purpose, but says that it fears that in doing so it will be deemed a Ballot Question

---

[16] Id. ¶¶ 26-40 and E-Mail Updates from NOM (Ex. 5 to Verified Compl.).
[17] Verified Compl. ¶ 39.
[18] Id.
[19] Id. ¶ 40 and NOM July 2009 Newsletter at 3 (Ex. 6 to Verified Compl.).
[20] Verified Compl. ¶ 40 and NOM July 2009 Newsletter (Ex. 6 to Verified Compl.).
[21] Verified Compl. ¶¶ 26, 27, 29, 32-35, 37.
[22] Id. ¶ 7.
[23] Id.
[24] Id. ¶¶ 47-49.

Committee under § 1056-B, and therefore will not proceed.[25]  Both NOM and APIA operate throughout the United States.[26]

Stand for Marriage Maine ("SMM") is the registered Political Action Committee ("PAC") that successfully qualified the people's veto referendum concerning the 2009 same-sex marriage law for the November 3, 2009, election ballot.[27]  NOM's Executive Director, Brian S. Brown, is a member of SMM's Executive Committee and is listed on SMM's PAC Registration as one of its primary decision-makers and fundraisers.[28]  As SMM's largest contributor, NOM has provided a total of $1,600,000 to SMM, 63% of all monetary contributions received by SMM through October 20, 2009.[29]  In the first two weeks of October 2009, NOM made three contributions to SMM totaling $1,100,000.[30]

On August 13 and 24, 2009, Fred Karger of Californians Against Hate sent e-mail correspondence to the Commission requesting that the Commission investigate whether SMM and NOM had violated Maine's campaign finance laws by concealing their contributors.[31]  On August 27, 2009, the Commission invited SMM and NOM to respond and they did so.[32]  On October 1, 2009, the Commission conducted a preliminary fact gathering proceeding on the

---

[25] Id. ¶¶ 50-51.

[26] Id. ¶ 23; Pls. Mot. for Temporary Restraining Order at 2.  I note that the Verified Complaint does not state that APIA operates in all 50 states.

[27] Aff. of Jonathan Wayne ¶ 43 (Docket Item 19) and SMM PAC Registration (Ex. 7 to Wayne Aff.).

[28] Wayne Aff. ¶ 44.

[29] Id. ¶ 45.

[30] Id. ¶¶ 46-47.  NOM's 2008 Tax return indicates that it received contributions and grants totaling $2,967,495.  NOM's 990 Return of Organization Exempt from Income Tax (Ex. 9 to Wayne Aff.).

[31] Wayne Aff. ¶ 51; E-Mail of Fred Karger to Maine Comm'n on Governmental Ethics dated August 13, 2009 (Ex. 9 to Verified Compl.); E-Mail of Fred Karger to Maine Comm'n on Governmental Ethics dated August 24, 2009 (Ex. 10 to Verified Compl.).

[32] Wayne Aff. ¶ 51.  NOM and SMM responded through two letters and NOM provided a follow-up
*(continued on next page)*

allegations.[33]   After considering the evidence and legal argument submitted by NOM and SMM, the Commission decided to authorize its staff to conduct an investigation into whether NOM had violated § 1056-B by failing to register and file campaign finance reports as a Ballot Question Committee.[34]   To date, the investigation has not started and the Commission has not yet made any requests for information or documents to NOM.[35]  The Commission staff anticipate that the investigation will end no earlier than March 31, 2010.[36]  After the Commission completes the investigation, the Commission staff will consider whether to recommend any finding of violation against NOM for failing to register and file campaign finance reports as a Ballot Question Committee.[37]    Thus, the Commission will not take any enforcement action against NOM before the November 3, 2009 election.[38]

## ANALYSIS

The plaintiffs challenge four aspects of the Maine ballot question statute. First, they say that the overall registration and reporting requirements are unconstitutional under existing caselaw.  Second, they say that the statute and regulations cannot constitutionally apply to them because influencing the Maine election is not their major purpose.  Third, they say that parts of the statute are unconstitutionally vague and do not give fair notice of what is, and what is not,

---

affidavit from Mr. Brown.  Id. ¶ 52.
[33] Id. ¶ 54.
[34] Id.; Verified Compl. ¶ 42 and Letter from the Maine Comm'n on Governmental Ethics dated October 2, 2009 (Ex. 11 to Verified Compl.).
[35] Wayne Aff. ¶ 55.
[36] Id. ¶ 56.
[37] Id.
[38] Id.

included under the reporting requirements.  Fourth, they say that the requirement that they report every contribution or expenditure over $100 (once they meet the $5,000 threshold) is constitutionally too burdensome.

In response, the defendants say that I should refuse to decide the case because the dispute is not "ripe," or that I should abstain and leave the entire matter to the state election authorities and the state courts.  If I reject those arguments and do reach the merits, the defendants say that I should decide that the statute is constitutional under the First Amendment.

*(A)*      ***Ripeness***

The defendants argue that the plaintiffs' claims are not ripe since neither organization has yet been threatened with prosecution for failing to register and to make the disclosures required by Section 1056-B.[39]  Moreover, the defendants suggest that any threat of prosecution is highly attenuated, since the Commission will not even consider enforcement action against NOM until March 2010 at the earliest.[40]  In other words, the defendants contend that the plaintiffs have not yet suffered an injury and do not expect an imminent injury, and therefore they do not present a "case or controversy" giving federal jurisdiction over their constitutional challenges.[41]

When plaintiffs allege that they will engage in conduct "arguably affected with a constitutional interest, but proscribed by [a] statute, and there exists a

---

[39] Defs.' Opp'n to Pls.' Mot. for Temporary Restraining Order at 7-8 (Docket Item 18).

[40] Wayne Aff. ¶ 56.

[41] See Ramirez v. Ramos, 438 F.3d 92, 97 (1st Cir. 2006) ("[W]hen a litigant wishes to pursue a claim in a federal court, justiciability principles require the existence of an actual case or controversy. (citing U.S. Const. art. III, § 2, cl. 1)).

credible threat of prosecution,"[42] or when plaintiffs are "chilled" from exercising First Amendment rights out of fear of "enforcement consequences,"[43] they need not wait for actual harm before seeking relief.[44]  A credible threat of prosecution for protected political expression *is* actual harm because it presents a constitutionally unacceptable dilemma: "either to engage in the expressive activity, thus courting prosecution, or to succumb to the threat, thus forgoing free expression."[45]  Here, APIA has said that it will not run its commercials because donations solicited for the purpose of airing the advertisements might be considered "contributions" triggering Ballot Question Committee status.[46] To be sure, the threat of prosecution must be credible,[47] but "the evidentiary bar that must be met is extremely low."[48]  Here, NOM and APIA certainly have more than a "subjective and irrational fear of prosecution."[49]  The Commission decided to investigate NOM after reviewing information alleging that NOM had violated Section 1056-B as well as information submitted by NOM and NOM's representatives' statements at a meeting on October 1, 2009.[50]  The Commission plans to review NOM's activities to see if it has violated laws that provide for

---

[42] Id. at 99 (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

[43] Id. (quoting New Hampshire Right to Life PAC v. Gardner, 99 F.3d 8, 14 (1st Cir. 1996)).

[44] Id.

[45] New Hampshire Right to Life PAC, 99 F.3d at 14.

[46] Pls.' Mot. for Temporary Restraining Order 5.  The plaintiffs' Verified Complaint does not state explicitly that APIA will not run its advertisements in Maine, but it does say that APIA intends to buy television time but is "chilled" from doing so by the prospect of registration.  Verified Compl. ¶ 50.

[47] Mangual v. Rotger-Sabat, 317 F.3d 45, 57 (1st Cir. 2003) ("Courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." (quoting New Hampshire Right to Life PAC, 99 F.3d at 15)).

[48] Id.

[49] Id.

[50] Wayne Aff. ¶¶ 51-54.

criminal and civil penalties.   In effect, then, NOM is on notice of potential prosecution.   The Commission is not investigating and has not threatened to investigate APIA, but APIA is aware of the Commission's interest in NOM and can have little doubt that § 1056-B "is aimed directly" at entities like APIA.[51]  APIA had planned to buy television time to air commercials supporting Question 1 in advance of the November 3 election but has said without contradiction that it will not engage in protected speech unless I find the statute unconstitutional.   Under these circumstances, NOM and APIA face a credible threat of prosecution or enforcement consequences and accordingly the case is ripe.

**(B)**     ***Abstention***

The defendants also urge me to abstain from hearing this case because it involves a complex state administrative scheme and requires me to resolve issues of state law that state agencies should have an opportunity to construe in the first instance.[52]  If this case involved registration and disclosure of information from utility companies or from lumber companies seeking permits without First Amendment overtones,[53] that argument might be persuasive.   But this case involves potential harm to those who wish to speak out on a ballot question, freedoms guaranteed by the First Amendment.   If I were to abstain, NOM and APIA would have to wait for the State of Maine to address their concerns after the election. In the context of an impending election, this delay "might itself effect the

---

[51] <u>Virginia v. Am. Booksellers Ass'n</u>, 484 U.S. 383, 392 (1988) (holding that where there is no indication that a law will not be enforced and there is "actual and well-founded fear that the law will be enforced," the harm of self-censorship "can be realized even without an actual prosecution").

[52] <u>See</u> <u>New Orleans Pub. Serv., Inc. v. New Orleans</u>, 491 U.S. 350, 361-64 (1989).

[53] <u>See</u>, <u>e.g.</u>, <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943) (oil drilling permits).

impermissible chilling" of the very constitutional rights at issue.[54]  In view of this danger, the Supreme Court has held that in the context of colorable facial challenges to state law based on the First Amendment, abstention is inappropriate.[55]

### (C)   Standards For Assessing The Plaintiffs' Claims

To obtain a temporary restraining order, NOM and APIA must show:  (1) a likelihood of success on the merits; (2) a significant risk that they will suffer irreparable harm if I do not enjoin the State of Maine from enforcing Section 1056-B; (3) that the harm they will suffer outweighs any harm to the interests of the State of Maine that the temporary restraining order will cause; and (4) that the temporary restraining order is in the public interest.[56] The most important factor is likelihood of success on the merits.[57]

On the merits, in assessing the constitutionality of a registration and reporting statute in an election law context, the Supreme Court has articulated certain principles and standards for the level of scrutiny.  Compelled disclosures, like the registration and reporting requirements in § 1056-B, can "seriously infringe on privacy of association and belief guaranteed by the First

---

[54] Houston v. Hill, 482 U.S. 451, 468 (1987) (quoting Zwickler v. Koota, 389 U.S. 241, 252 (1967)).

[55] Id. ("Abstention . . . is inappropriate for cases [where] . . . statutes are justifiably attacked on their face as abridging free expression." (quoting Dombrowski v. Pfister, 380 U.S. 479, 489-90 (1965)); see also Porter v. Jones, 319 F.3d 483, 493 (9th Cir. 2003) (explaining that abstention is usually inappropriate in First Amendment cases because "guarantee of free expression is always an area of particular federal concern" (quoting Ripplinger v. Collins, 868 F.2d 1043, 1048 (9th Cir. 1989)).

[56] Winter v. NRDC, Inc., 129 S. Ct. 365, 374 (2008); see also Curnin v. Town of Egremont, 510 F.3d 24, 28 (1st Cir. 2007).

[57] Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. *(continued on next page)*

Amendment."[58]   Serious encroachments caused by compelled disclosure must therefore survive "exacting scrutiny,"[59] but "[e]ven a 'significant interference' with protected rights of political association may be sustained if the State demonstrates (1) a sufficiently important interest and (2) employs means closely drawn to avoid unnecessary abridgment of associational freedoms."[60]   Accordingly, I must "closely scrutinize" the requirements of § 1056-B to ensure that they are justified by more than a "mere showing of some legitimate governmental interest."[61]   As the Supreme Court recently explained in Davis v. FEC, to pass constitutional muster there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed,"[62] and "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."[63]

---

2002)).

[58] Buckley v. Valeo, 424 U.S. 1, 65 (1976).

[59] Davis v. FEC, 128 S. Ct. 2759, 2775 (2008) (quoting Buckley, 424 U.S. at 64).  Other courts have struggled over whether "strict scrutiny," which requires the state to prove that a regulation "furthers a compelling interest and is narrowly tailored to achieve that interest," FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 465 (2007), should apply to review of disclosure requirements.  See, e.g., Canyon Ferry Rd. Baptist Church of East Helena, Inc. v. Unsworth, 556 F.3d 1021, 1031 (9th Cir. 2009) (noting uncertainty as to the proper standard of review created by McConnell v. FEC, 540 U.S. 93 (2003), and "assum[ing] without deciding that 'heightened'—not 'strict'—scrutiny applies").  In Davis, the Court reviewed disclosure requirements in the Bipartisan Campaign Reform Act of 2002 and clearly laid out the standard that I apply here.  The difference between exacting scrutiny and strict scrutiny does not alter my analysis of NOM's and APIA's challenge to Section 1056-B.  It plays no part, for example, in the question of constitutional overbreadth and vagueness, and as explained below, I find that Maine's disclosure and registration requirements are narrowly tailored to the state's compelling informational interest.

[60] Buckley, 424 U.S. at 26 (citing Cousins v. Wigoda, 419 U.S. 477, 488 (1975); NAACP v. Button, 371 U.S. 415, 438 (1963); Shelton v. Tucker, 364 U.S. 479, 488 (1960); see also McConnell, 540 U.S. at 311 (Kennedy, J., concurring and dissenting in part).

[61] Davis, 128 S. Ct. at 2775 (citing Buckley, 424 U.S. at 64).

[62] Id.

[63] Id. (citing Buckley, 424 U.S. at 68).

**(D)**     ***Reporting Requirements For Issue-Only Elections***

It is important to emphasize that the Maine statute does not *prohibit* contributions or expenditures.  Instead, it is a registration and reporting statute.  The plaintiffs recognize that the Supreme Court and other courts have held uniformly that states can constitutionally require some reporting of contributions and expenditures in issue-only elections.  The line of cases began with one involving the regulation of a federal election for candidates.  In <u>Buckley v. Valeo</u>, the Supreme Court recognized that disclosure and reporting requirements serve the state's important informational interest in helping voters define the constituencies of candidates.  Accordingly, the Court upheld as constitutional the recordkeeping, reporting, and disclosure provisions of the Federal Election Campaign Act of 1971 ("FECA") in candidate elections.[64]  Later, in <u>Citizens Against Rent Control v. Berkeley</u>, the Court held that disclosure of contributions for a municipal ballot measure (ballot measure disclosures are at the heart of this case) can help to protect the "integrity of the political system."[65]  Still later, in <u>Buckley v. American Constitutional Law Foundation</u>, while striking down a number of Colorado regulations concerning that state's petition process, the Court reiterated that a state has an interest in informing the public "where political campaign money comes from."[66]  It said that a state could require the sponsors of ballot initiatives to disclose the identities of those paying petition circulators and how

---

[64] <u>Buckley</u>, 424 U.S. 1, 82, 84 (1976).
[65] <u>Berkeley</u>, 454 U.S. 290, 299-300 (1981).
[66]  <u>Buckley v. American Constitutional Law Found.</u>, 525 U.S. 182, 202 (1999) (quoting <u>Buckley</u>, 424 U.S. at 66).

much they paid.[67]  In <u>Volle v. Webster</u>, I concluded that these precedents were "an unequivocal declaration" that public filing requirements in issue-only elections are not "wholly prohibited."[68]  And in the years since then, the Supreme Court has continued to uphold disclosure and registration requirements because of the government's important interest in making the information available to voters.[69]

The Ninth Circuit has spoken more recently to the importance of such disclosures in the particular context of ballot initiatives.  In <u>California Pro-Life Council, Inc. v. Getman</u>, that court rejected the argument that the California Political Reform Act could not impose disclosure and reporting requirements on ballot-measure advocacy. It reasoned that "[v]oters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation . . . and that voters as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much."[70]  In <u>California Pro-Life Council, Inc. v. Randolph</u>, the Ninth Circuit said that the "government's interest in providing the electorate with information related to election and ballot issues is well-established" and cited empirical data tending to show that the gopvernment's interest has a sound basis.[71]  Most recently, in

---

[67] <u>Id</u>. at 205.
[68] <u>Volle</u>, 69 F. Supp. 2d 171, 174 (D. Me. 1999).
[69] <u>See, e.g.</u>, <u>McConnell</u>, 540 U.S. at 202.
[70] <u>California Pro-Life Council, Inc. v. Getman</u>, 328 F.3d 1088, 1106 (9th Cir. 2003).
[71] <u>California Pro-Life Council, Inc. v. Randolph</u>, 507 F.3d 1172, 1179 n.8 (9th Cir. 2007) (Researcher "conducted a telephone survey from June 23-26, 2001[, and found that:] '[M]ore than seven of ten California voters (71%) state that it is important to know the identity of the source and <i>(continued on next page)</i>

15

<u>Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth</u>, the Ninth Circuit found that Montana could constitutionally require some disclosure in the context of ballot campaigns in order to prevent "the wolf from masquerading in sheep's clothing" and to give voters "a pretty good idea of who stands to benefit from the legislation."[72]   The court rejected the argument that since Montana's political system appeared open and functional, the state's informational interest in disclosure was not compelling.[73]

With that background uniformly supporting the principle of reporting requirements, I turn to the plaintiff's specific objections to Maine's ballot question statute.[74]

---

amount of campaign contributions to the ballot measure by both supporters and opponents, including unions, businesses or other interest groups.' 'Fifty seven percent (57%) of California voters state that endorsements by interest groups, politicians or celebrities are important in helping them make up their own mind on how to vote on ballot measures.' 'A majority of California voters (57%) state they would be less likely to vote for a proposition to build senior citizen housing if the proposition was supported by a well-known and respected senior activist who was discovered to have been paid by developers to promote the proposition. Only one-third (34%) stated that this information would not make any difference in their vote.'").

[72] <u>Canyon Ferry</u>, 556 F.3d at 1032 (quoting <u>Getman</u>, 328 F.3d at 1106 n.24, 1106).

[73] <u>Id</u>.

[74] I observe that the plaintiffs have not made a colorable claim that their First Amendment rights of free association are threatened by harassment that might follow disclosure.  The state's strong interest must give way if there is a "reasonable probability" that compelled disclosure would subject contributors "to threats, harassment, or reprisals from either Government or private parties."  <u>Buckley</u>, 424 U.S. at 74 (holding that minor parties may be exempt from disclosure requirements by showing that members could be harassed); <u>see also</u> <u>NAACP v. Alabama ex rel. Patterson</u>, 357 U.S. 449, 462 (1958) (same).  NOM and APIA, however, have not claimed that disclosure would subject their contributors to danger or harassment, nor is there a record here indicating a pattern of threats or specific manifestations of public hostility towards them or showing that individuals or organizations holding similar views have been threatened or harmed.  <u>See</u> <u>Buckley</u>, 424 U.S. at 74; <u>see also</u> <u>McConnell</u>, 540 U.S. at 199 (Stevens and O'Connor, JJ) (affirming district court finding that an exemption from disclosure requirements due to concern with harassment was inappropriate absent specific evidence about the basis for such fears); <u>Cal. Pro-Life Council</u>, 507 F.3d at 1189 (holding that a disclosure requirement was not unconstitutionally overbroad without a showing that contributors could be injured by public disclosure).

**(E)**     ***The Plaintiffs' Attacks on the Maine Statute and Regulations***

    **(1)**     ***Registration***

Although the plaintiffs recognize that First Amendment cases consistently hold that states can require disclosure of the source of money spent on ballot questions, they say that Maine has gone too far.  The plaintiffs argue that Maine treats them too much like PACs (registration, required treasurer, records maintenance, recurrent reporting),[75] and say that a number of cases have said that states cannot treat issue-only organizations and individuals like PACs.  They contend that Maine is entitled to demand only "one-time" disclosure of the contributions and expenditures.

It is true that a number of cases have criticized the PAC-style regulatory model that Maine seems to be approaching, when that regime is applied to those who do not support candidates, but simply take positions on issues, as here.[76] Issue advocacy is the classic heart of First Amendment protection and should be burdened as little as possible.[77]  Regulation tends to grow and to develop requirements appropriate for large organizations (like these plaintiffs) and to ignore the burdensome effects on the speech of individuals and small organizations.  I reached that very conclusion in <u>Volle</u>, a case involving an individual asserting his First Amendment rights.  <u>Volle</u> provoked the initial version of this legislation in 2000.  In response to <u>Volle</u>, Maine adopted financial

---

[75] They also challenge the requirement that they "use a designated account," Pls.' Mot. for Temporary Restraining Order at 7, but I see no such requirement in the statute or regulations.

[76] <u>Volle</u>, 69 F. Supp. 2d 171 (D. Me. 1999)(ballot question case); <u>Emily's List</u>, 581 F.3d 1 (D.C. Cir. 2009)(candidate case); <u>Cal. Pro-Life Council</u>, 507 F.3d 1172 (9th Cir. 2007)(ballot question case).

[77] <u>Volle</u>, 69 F. Supp. 2d at 172.

reporting-requirement legislation and did not impose the other layers of regulation. They emerged in only the 2007 amendments.

Nevertheless, I conclude that the plaintiffs cannot show a likelihood of success on their claim.

The registration requirements here are much less burdensome and more narrowly tailored than those I confronted in Volle. The person or organization who exceeds the $5,000 threshold must register, identify a treasurer (these corporations already have one; an individual can identify himself), and identify other important actors (if any). All that can be done on a simple 2-page form, with help from the Commission staff. Bureaucratic perhaps, but burdensome not. This is unlike the regime I struck down in Volle where, once the monetary threshold was passed, the individual automatically became a political action committee with the attendant requirements to disclose the names, addresses and account numbers of the depositories in which committee funds were kept. Moreover, the State has identified its compelling reason for imposing the registration requirement—namely, to provide important information to Maine voters about the interest groups that are attempting to influence the outcome of a ballot question in a climate where the number of ballot questions Maine voters face is steadily increasing.[78]

---

[78] The state asserts, and I agree, that each registration requirement is narrowly tailored to its compelling informational interest. For example, the treasurer requirement simply provides a contact person and the registration statement "provides the public with essential background about who is trying to influence their vote." Def.'s Opp'n to Pls.' Mot. for Temporary Restraining Order at 13. Registration serves the additional purpose of providing a list for the public with the names of individuals or entities most interested in the ballot question on a schedule aligned with those times that the public and the press are most likely to seek the information. Id. 13-14.

Recent cases support my conclusion that this is not constitutionally burdensome.  In <u>Alaska Right to Life Committee v. Miles</u>, the Ninth Circuit considered provisions of Alaska's campaign laws requiring entities to register before spending money to support or oppose a candidate.[79]  Alaska's registration form was 2 pages and asked for basic information, including the entity's name and purpose, the names and contact information of its officers, its campaign plans, and banking information if the entity anticipated raising more than $5,000.[80]  The court concluded that such requirements were "not significantly burdensome in themselves."[81]  Similarly, in <u>Human Life of Washington, Inc. v. Brumsickle</u>, registration requirements survived strict scrutiny because they were, in themselves, "not particularly onerous," and incorporated $5,000 contribution and expediture threshold requirements that avoided "unduly burdening the smaller or less active organizations that might be more likely to self-censor their speech rather than comply with the state's requirements."[82]

I also conclude that the plaintiffs cannot show a likelihood of success on their challenge to Maine's recurrent reporting requirement.  Maine's compelling interest in ensuring that the electorate knows who is financially supporting the views expressed on a particular ballot question cannot be satisfied by one-time

---

[79] <u>Alaska Right to Life Comm. v. Miles</u>, 441 F.3d 773, 789 (9th Cir. 2006).

[80] <u>Id</u>.

[81] <u>Id</u>.

[82] <u>Human Life of Wash., Inc. v. Brumsickle</u>, 2009 U.S. Dist. LEXIS 4289, at *34-35 (W.D. Wash. Jan. 8, 2009) (quoting <u>Alaska Right to Life</u>, 441 F.3d at 791) (finding constitutional registration requirements including appointment of a treasurer, designation of a bank account, filing a statement of organization and disclosure requirements for groups intending to raise or spend more than $ 5,000 or to raise more than $500 from any one contributor); <u>see also</u> <u>Canyon Ferry</u>, 556 F.3d at 1035 (finding disclosure requirements unconstitutional where no dollar threshold but explicitly withholding judgment as to whether the requirements, which the court described as "not *(continued on next page)*

reporting.  Instead, Maine is entitled to conclude that its electorate needs to know, *on an ongoing basis*, the source of financial support for those who are taking positions on a ballot initiative.  It will not do to say that a one-time disclosure in the week before the election is sufficient.  That would not give the opposing viewpoint the opportunity to point out the source of the financing and seek to persuade the electorate that the source of support discounts the message.[83]  Here, the Maine statute requires reports on the following schedule: (1) an initial report upon registration as a Ballot Question Committee;[84]  (2) quarterly reports on January 15th, April 15th, July 15th, and October 15th;[85]  (3) certain disclosures about expenditures made close to the election;[86] and (4) a final report.[87]  That is an appropriate, not burdensome, schedule.  Its predictability makes it easy for the news media to follow and to cover the story for the public, and for opponents to inquire and spread the word as they see patterns develop.  The extra reporting requirement for the period immediately preceding the election ensures that people will not avoid disclosure by scheduling their contributions and expenditures late.

Recordkeeping is essential to enforcement.  The pace of activities leading up to an election means that careful investigation must often be delayed (as here).  The Commission may have a variety of people and organizations to investigate, which takes time.  The four-year requirement certainly seems to be at the outer

---

exceedingly onerous," might pass constitutional muster with protection for small donors).

[83] Maine's current flexibility in absentee voting accentuates this need for ongoing disclosure, since Maine citizens now are not limited to voting on Election Day.

[84] 21-A M.R.S.A. § 1059.

[85] 21-A M.R.S.A. § 1059(2)(A).

[86] 21-A M.R.S.A. § 1059(2)(C).

[87] 21-A M.R.S.A. § 1061.

limit, however.  It is hard to envision, given election frequency, that a Commission concerned with elections would still be seriously investigating four years after an election.  But the plaintiffs have not made any credible argument that if records must be kept for two years, there is a measurable incremental burden in keeping them for four years.

I conclude that the plaintiffs cannot show that it is likely that these regulations and reporting requirements fail the exacting scrutiny test.

### *(2)    Major Purpose*

The plaintiffs assert that Section 1056-B is unconstitutional because it imposes PAC-style requirements on them even though neither organization has as its major purpose the initiation, promotion, or defeat of a ballot measure.[88]  They claim that "to protect [the right of freedom of association] and to assure that registration requirements do not chill core political speech, <u>Buckley v. Valeo</u> established the 'major purpose' test, which is used to determine whether a particular group must register as a political committee under federal election law." They say that "[t]he purpose of the test is to reduce the burden on First Amendment speech by groups that are only incidentally involved in advocating the election or defeat of a candidate."[89]  They argue that the major purpose test should apply to void the application of Maine's PAC-like registration requirements to them, because passage or defeat of the ballot measure is *not* their major purpose.

---

[88] Pls.' Mot. for Temporary Restraining Order at 10.
[89] <u>Id</u>.

Buckley did hold that only entities "under the control of a candidate or the major purpose of which is the nomination or election of a candidate" could be regulated as political committees under the Federal Election Campaign Act of 1971.[90]  The Supreme Court thereby sought to reduce FECA's burden on First Amendment political speech by groups that are only incidentally involved in advocating the election or defeat of a candidate.  The Court distinguished general political debate from expression directed at the election of candidates.[91]  But although the Buckley Court found that the major purpose test alleviated its overbreadth concerns in that context of federal regulation of candidate elections, the Supreme Court has never suggested that the major purpose test applies everywhere—as, for example, in this case involving state regulation of ballot questions only.  Federal ballots, unlike state ballots, *only* have candidate elections, and that is all that the FECA could legitimately regulate.  It made sense, therefore, for Buckley to distinguish general issue advocacy and to protect it, under the First Amendment, from regulation directed at candidate elections and, in doing so, to limit the federal regulation of political committees to committees that were candidate-controlled or whose major purpose was the nomination or election of a candidate.  The plaintiffs urge me to import the major purpose test into this quite different area of state regulation of ballot questions where there are *no* candidates and where the entire focus is on disclosing who is behind the

---

[90] 424 U.S. at 79.
[91] See Fed. Election Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 263 (1986) (holding that an organization that "only occasionally engage[d] in independent spending on behalf of candidates" could not be subjected to PAC-style disclosure requirements).

funding of a particular issue on which the electorate will be voting.[92]  They give me no reason for doing so.[93]  Instead, I observe that the Supreme Court has permitted certain kinds of state regulation in such cases (as I discuss above under Reporting Requirements for Issue-Only Elections), without referring to the major purpose test.  Accordingly, I assess the state interest and the burdens on speech as to each of the challenged requirements, applying the level of scrutiny identified in Davis, without imposing a separate "major purpose" test.[94]  I do not find that the Maine statute's PAC-style reporting requirements are overbroad simply because they are imposed on organizations[95] whose major purpose is not the promotion or defeat of a ballot initiative in Maine.[96]

### (3)   Vagueness

The plaintiffs challenge the contribution definitions[97] as unconstitutionally vague both on their face and as applied.[98]  The statute requires a person or

---

[92] Judge Coughenour explores this difference in Human Life of Washington, 2009 U.S. Dist. 4289, at *51-53.

[93] The argument might be more persuasive if the arena were one of candidate elections, and the laws pertinent to that arena were being applied to these organizations engaged in issue advocacy. See, e.g., Colorado Right to Life Comm., Inc. v. Coffman, 498 F.3d 1137 (10th Cir. 2007).

[94] See Alaska Right To Life Comm., 441 F.3d at 789-92.  The Ninth Circuit upheld the imposition of PAC-style requirements without regard to a corporation's "major purpose," noting that the requirements were "not particularly onerous" and were justified by the state's strong informational interests in disclosure that the Supreme Court recognized in Buckley and McConnell.  Id. at 790. The Alaska Right to Life Committee was subject to the PAC-style requirements as a "nongroup entity . . . the major purpose of which is to influence the outcome of an election," id. at 779, even though it described its major purpose as promoting "a pro-life consensus in Alaska's public through the presentation of its pro life message," id. at 776.

[95] This is also not a case like Massachusetts Citizens for Life, 479 U.S. 238, or Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990), both of which challenged extra burdens imposed because corporations were involved.  Maine's ballot question regulations do not depend on the use of the corporate form.

[96] The major purpose test would be especially pernicious if applied here.  An organization could have the major purpose of affecting ballot initiatives all over the country, but because of its wide-ranging scope avoid the finding that its role in any single state's ballot initiative was its major purpose.

[97] At the hearing, they confirmed that they do not challenge the expenditure definitions for *(continued on next page)*

organization to report each contribution over $100 (once the $5,000 threshold is met). It defines "contribution" as including, but not limited to[99]:

    A.    Funds that the contributor specified were given in connection with a ballot question;

    B.    Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating, promoting, defeating or influencing in any way a ballot question;

    C.    Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating, promoting, defeating or influencing in any way a ballot question when viewed in the context of the contribution and the recipient's activities regarding a ballot question; and

    D.    Funds or transfers from the general treasury of an organization filing a ballot question report.[100]

I see no vagueness in subsection A.[101] When a contributor *specifies* that funds are "given in connection with a ballot question," there is no room for confusion. The plaintiffs agreed with this conclusion at the hearing.

---

vagueness.

[98] A "facial challenge must fail where the statute has a 'plainly legitimate sweep.'" <u>Wash. State Grange v. Wash. State Republican Party</u>, 552 U.S. 442 (2008) (quoting <u>Washington v. Glucksberg</u>, 521 U.S. 702, 739-40 (1997) (Stevens, J., concurring in judgments)).

[99] Neither party has addressed the phrase "not limited to." Since the Commission has not in its regulatory materials tried to enlarge the definition of "contribution" through that phrase, I do not address it further.

[100] 21-A M.R.S.A. § 1056-B(2-A).

[101] A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously *(continued on next page)*

I also see no vagueness in subsection B.  The plaintiffs argue that they cannot know what was in their contributors' minds.  But the definition here is an objective standard tied to what the *plaintiffs* said in obtaining the funds, and they are in control of what they say.  If their solicitation "would lead the contributor to believe that the funds would be used specifically for the purpose of initiating, promoting, defeating or influencing in any way a ballot question," then it is proper to conclude that the resulting gift was for such a purpose.  That is the ordinary way in which language and communication work.  Any other answer would allow the solicitor to propose all the relevant limitations and conditions in the solicitation, then argue unfairly that the resulting gift that did not expressly repeat those limitations and conditions could not be characterized as to purpose.

There is also no vagueness in subsection D, as the plaintiffs agreed at the hearing.  It is straightforward to determine what funds or transfers came from the organization's general treasury.

There are really only two vagueness issues:   first, how to count contributions that are made for, or that respond to solicitations for, ballot initiatives in more than one state; second, what subsection C adds to subsections A and B.

Some of NOM's solicitations were as follows:

---

discriminatory enforcement."  United States v. Williams, 128 S. Ct. 1830, 1845 (2008) (citing Hill v. Colorado, 530 U.S. 703, 732 (2000)).  A plaintiff engaging in clearly proscribed conduct cannot complain about vagueness, but in the First Amendment context, a plaintiff may argue that a statute is "overbroad because it is unclear whether it regulates a substantial amount of protected speech."  Id. (citing Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-95, and nn.6 and 7 (1982)).  A statute is unconstitutionally overbroad only if its overbreadth is "substantial not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."  Id. at
*(continued on next page)*

- "Your support today will allow us to start the referendum process immediately when the law is signed, ensuring that the measure does not take effect before the people of Maine have had their say.  Can you afford a gift of $35, $50 or $100 today to help stop same-sex marriage not just in Maine, but in New Hampshire, Iowa, and other states as well?"[102]

- "You can fight back! Can you help defend marriage in Maine and across the country, by donating $5, $10, or even, if God has given you the means, $100 or $500?"[103]

- "We will fight to be your voice in New Hampshire, Maine (more on that next week), Iowa, New York, New Jersey, D.C. and all across this great and God-blessed country of ours."[104]

- "To help us in Maine and all 50 states, can you make a monthly donation?"[105]

- "The National Organization for Marriage worked hard with StandforMarriageMaine to make this happen.  But it could not have happened without your help!  You are the ones who made this happen . . . and we need you to help secure this victory: Can you help us with $10, 25, or $100 so that Maine and our country can recover the true meaning or marriage?"[106]

- "Use this hyperlink to help support NOM's work not only in Maine but around the country, wherever the need arises."[107]

- "Help us fight to protect marriage in Iowa, Maine and everywhere across this great land donate today!"[108]

When I pressed the defendants' lawyer at the hearing how those should be calculated for reporting purposes (the $5,000 or the $100 threshold) and pointed her to the California model where pro rating among states occurs, she conceded

---

1838 (citing Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 485 (1989)).
[102] Verified Compl. ¶ 26 and NOM e-mail at 2-3 (Ex. 5 to Verified Compl.).
[103] Verified Compl. ¶ 27 and NOM e-mail at 4 (Ex. 5 to Verified Compl.).
[104] Verified Compl. ¶ 28 and NOM e-mail at 7 (Ex. 5 to Verified Compl.).
[105] Verified Compl. ¶ 30 and NOM e-mail at 11 (Ex. 5 to Verified Compl.).
[106] Verified Compl. ¶ 32 and NOM e-mail at 14 (Ex. 5 to Verified Compl.).
[107] Verified Compl. ¶ 35 and NOM e-mail at 23 (Ex. 5 to Verified Compl.).
[108] Verified Compl. ¶ 37 and NOM e-mail at 28 (Ex. 5 to Verified Compl.).

that pro rating might be a fair approach.  But in fact the Maine statute does not mention pro rating and the Maine Commission on Governmental Ethics and Election Practices has not, by regulation or form, created a pro rating regime. The clear language of the statute requires reporting the entire amount, even though some of that contribution might ultimately be devoted to other states.  The language is neither vague or substantially overbroad.  One might argue that including the entire amount given in response to a multi-purpose solicitation is excessive, but that approach might also be defended as a legitimate tool to corral those who seek to escape the statute by clever wording in their solicitations.  In any event, the plaintiffs have not identified any constitutional defect in considering the entire amount of such contributions as attributable to Maine.

Identifying the meaning of subsection C is somewhat more difficult, and even the defendants' lawyer had trouble at the hearing specifying what contributions  subsection C would cover that are not already within subsections A and B.  Subsection A covers contributions that are "earmarked" specifically for a ballot purpose.  Subsection B covers contributions that are not themselves "earmarked," but are in response to solicitations that make clear that the funds will be used for a ballot purpose, and thus are "earmarked" because the solicitor established that premise for the contribution.  Subsection C seeks to cover still other contributions.  Presumably the statute's drafters were concerned that those who solicit contributions might find devious ways to avoid coverage by keeping the language of both the solicitation and the donation clean of any suggestion of earmarking, even though everyone knew what was going on.  The language that

they chose to capture this category is clumsy.  But as the plaintiffs agreed at the hearing, the vagueness question is evaluated only from the perspective of the person or organization required to report, and it is perfectly clear to tell them, as this subsection does, that if they reasonably should know from the entire context of what they are doing that a particular contribution is designed to influence a particular ballot, then they should treat it as such.[109]  I conclude that they are unlikely to be able to prove that it is unconstitutionally vague or substantially overbroad.

### (4)    The $100 Threshold

Once a person or entity reaches the $5,000 (more than) threshold, it must report each expenditure to, and each contribution, from a single source if, in aggregate, they exceed $100.  The plaintiffs say that the $100 limit is not narrowly tailored to Maine's interest in providing voters with information about who supports a proposition.[110]  They contend that information about small, individual donors has "little, if any" value to voters and that, therefore, disclosure of small donors' names, addresses, occupations, and employers is a burden wholly out of proportion to the state's interest.[111]

I disagree.  Buckley held that disclosure of contributions to candidates can help "voters to define more of the candidates' constituencies."[112]  Buckley's logic holds here.  As the Ninth Circuit explained in Getman, "[k]nowing which

---

[109] In response to my questions at the hearing, they agreed that vagueness, although an objective standard, should be measured from the perspective of the reporting person or organization, not from the perspective of the once-removed contributor.
[110] Pls.' Mot. for Temporary Restraining Order at 18.
[111] Id. at 18-19.

interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown.  At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation."[113]  The public has an interest in knowing, for example, that a ballot measure has been supported by a multitude of gifts, even small gifts, from a particular state or from a specific profession.[114]  Such information could be crucial in the context of ballot measures involving public works projects or regulatory reform.  The issue is thus not whether voters clamor for information about each "Hank Jones" who gave $100 to support an initiative.  Rather, the issue is whether the "cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill."[115]  Like the Protectmarriage.com court, I conclude that the state's interest to provide this information to voters is "not only compelling but critical" to the proper functioning of the system of direct democracy.[116]  The $100 threshold in § 1056-B is narrowly tailored to the state's interest.  It protects from public disclosure those small donors who offer a campaign de minimis support, and focuses voters on those backers of a measure most likely to represent the referendum's constituency.  Under Buckley, I cannot require the Maine legislature

---

[112] Buckley, 424 U.S. at 81.

[113] Getman, 328 F.3d at 1106.

[114] ProtectMarriage.com v. Bowen, 599 F. Supp. 2d 1197, 1211 (E.D. Cal. 2009) ("Surely California voters are entitled to information as to whether it is even citizens of their own republic who are supporting or opposing a California ballot measure.").

[115] Id. at 1211.

[116] Id.

to show that it has chosen the "highest reasonable threshold."[117]   The precise threshold required to trigger disclosure "is necessarily a judgmental decision, best left in the context of this complex legislation" to the Maine legislature.[118]  It is not apparent to me that the $100 threshold is "wholly without rationality."[119]  Instead, the threshold is substantially related to Maine's compelling interest in informing voters and narrowly tailored to avoid unnecessary impositions on associational rights.

### (5)    Other Requirements for a Temporary Restraining Order

Because I conclude that the plaintiffs have not shown a likelihood of success on the merits as to any of their challenges to the Maine statute, I do not need to address the other factors for awarding a temporary restraining order.

### CONCLUSION

I **DENY** the plaintiffs' request for a temporary restraining order because I conclude that the defendants are likely to succeed on the merits of this dispute. In doing so, I do not underestimate the strength of the First Amendment interests of individuals or groups that take positions on issues in the general run of political discourse, but without supporting or opposing candidates for election.  Some of the regulatory measures here seem to approach the limit of what can be permitted before unconstitutionally burdening their speech or association.  As I noted a decade ago in Volle, ballot measures, unlike candidate elections, typically do not

---

[117] Buckley, 424 U.S. at 83.

[118] Id.

[119] Id.; see also Vote Choice v. DiStefano, 4 F.3d 26, 33 (1st Cir. 1993) ("[S]o long as legislatively imposed limitations are not 'wholly without rationality,' courts must defer to the legislative will." (quoting Buckley, 424 U.S. at 83)); Protectmarriage.com, 599 F. Supp. 2d. at 1220-24.

implicate concerns about corruption or the appearance of corruption resulting from some sort of quid pro quo between a candidate and an interest group.[120] Ballot questions present the voters with a choice on the merits of the ballot issue, regardless of who is supporting or opposing it.  Maine has a strong and even compelling interest in helping the electorate assess the particular issue on its merits by providing voters with information about where the money supporting a measure has come from and therefore whose interest it serves.  But given the heartland First Amendment interests at stake for individuals or groups involved in issue advocacy, the caselaw makes clear that Maine cannot impose all the extensive impositions and PAC-style burdens used in regulating candidate elections.

**SO ORDERED.**

**DATED THIS 28TH DAY OF OCTOBER, 2009**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[120] <u>Volle</u>, 69 F. Supp. 2d at 176.