UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| NATIONAL ORGANIZATION ) | |
| FOR MARRIAGE, et al., ) | |
| ) | |
|     *Plaintiffs* ) | |
| ) | |
| v. ) | Civil No. 09-538-B-H |
| ) | |
| WALTER F. McKEE, et al., ) | |
| ) | |
|     *Defendants* ) | |

### MEMORANDUM DECISION AND ORDER
### ON SECOND SET OF DISCOVERY DISPUTES

On April 6, 2010, I heard oral argument on a second set of discovery disputes brought to my attention by the parties involving (i) the plaintiffs' objections on relevance and First Amendment privilege grounds to the defendants' second request for production of documents ("Second RFP") and (ii) the plaintiffs' asserted failure to supplement their initial witness disclosure and the defendants' requested remedy for that asserted deficiency. *See* Report of Hearing and Order re: Discovery Dispute (Docket No. 71).[1]

In view of the complexity of some of the issues, and without objection, I deferred ruling and directed that the parties file simultaneous initial briefs on April 14, 2010, addressing those subject matters and simultaneous responsive briefs on April 20, 2010. *See id*. Those briefs were

---

[1] In connection with this second set of discovery disputes, defendants' counsel Phyllis Gardiner submitted copies of the Plaintiffs' Response to Defendants' Second Request for Production ("Plaintiffs' Second RFP Response") and the Plaintiffs' Initial Disclosures as attachments to an email to the Portland ECF Inbox, and plaintiffs' counsel Josiah Neeley submitted copies of a Declaration of Brian Brown ("Brown Decl."), an Affidavit of Bruce I. Elder ("Elder Aff."), an Affidavit of J. Howard Hannemann ("Hannemann Aff."), an Affidavit of Linda Jones ("Jones Aff."), an Affidavit of Heidi Morse ("Morse Aff."), and an excerpt from the transcript of the January 21, 2010, deposition of Andresen Blom ("Blom Dep.") as attachments to an email to the Portland ECF Inbox. Mr. Neeley also relied on a previously submitted Declaration of Andresen Blom ("Blom Decl.) (Docket No. 43-1), attached to Plaintiff[s'] Objections to Report of Hearing and Order re: Discovery Dispute and Scheduling ("Objections") (Docket No. 43), and Affidavit of Joseph L. Bernatche ("Bernatche Aff.") (Docket No. 43-2), attached to Objections.

duly filed. *See* Defendants' Brief Concerning Pending Discovery Issues ("Defendants' Initial Brief") (Docket No. 73); Brief on Discovery Disputes ("Plaintiffs' Initial Brief") (Docket No. 74); Defendants' Reply Brief Concerning Pending Discovery Issues ("Defendants' Responsive Brief") (Docket No. 77); Reply to Defendants' Brief on Discovery Disputes ("Plaintiffs' Responsive Brief") (Docket No. 78).

With the benefit of the parties' oral argument and briefs, and for the reasons that follow, I sustain in part and overrule in part the plaintiffs' objections on relevance grounds to Second RFP Nos. 1 through 3, overrule their objection on First Amendment grounds to Second RFP No. 1, and order them to produce documents responsive to Second RFP Nos. 1, 2, and 3, as those requests are modified below, within seven days of the date hereof. I also deny, without prejudice on the showing made, the defendants' request to order the plaintiffs to supplement their initial disclosures and to bar them from using additional witnesses or documents to the extent that such supplementation is not made.

## I. Discussion

### A. Relevance Objections, Second RFP Nos. 1-3

In Second RFP No. 1, the defendants seek "[a]ll statements of account or similar documents for periods on or after January 1, 2008, from any account in a bank or any financial institution in the name of NOM [plaintiff National Organization for Marriage] or as to which NOM had authority to deposit or withdraw funds." Second RFP No. 1. In Second RFP No. 2, they seek "[a]ll statements for periods ending on or after January 1, 2008, for any credit card or debit card issued in the name of NOM." *Id*. No. 2. In Second RFP No. 3, they seek "[d]ocuments, including statements of account and canceled checks, showing all expenditures made by NOM since January 1, 2008." *Id*. No. 3.

The plaintiffs object to all three requests on grounds of both temporal and geographic overbreadth, arguing that:

1. Although the defendants seek information from January 1, 2008, forward, legislation targeting same-sex marriage was not signed into law until May 6, 2009, and the people's veto referendum overturning that law occurred on November 2, 2009. *See* Plaintiffs' Initial Brief at 2.

2. The questions are not limited to NOM's activities with respect to the people's veto referendum or even with respect to its expenditures in Maine generally, but rather seek information regarding its activities nationwide, which the plaintiffs contend have no bearing on the instant case. *See id*.

The objection is **SUSTAINED** in part, to the extent that the defendants will be permitted to inquire only as to information from January 1, 200<u>9</u>, forward, and otherwise **OVERRULED.** NOM has alleged, in relevant part, that Maine's Ballot Question Committee ("BQC") laws cannot be constitutionally applied to it because it "does not have as its major purpose the promotion or defeat of any Maine referendum or ballot question[,]" First Amended Verified Complaint for Declaratory and Injunctive Relief ("Complaint") (Docket No. 32) ¶ 25, and that Maine's campaign finance/political action committee ("PAC") laws cannot be constitutionally applied to it because it does not "have the major purpose of nominating or electing, a candidate or candidates, for state or local office in Maine[,]" *id*. ¶ 126 (citations omitted).

The defendants are entitled to test the foundations of these assertions, and NOM's financial information is relevant to that test. *See, e.g., Shays v. Federal Election Comm'n*, 511 F. Supp.2d 19, 29-31 (D.D.C. 2007). In turn, in assessing major purpose, the defendants rationally seek to compare the extent of NOM's activities in Maine against its activities

nationwide. The requests hence are not overbroad geographically. Nor are they overbroad temporally to the extent that the defendants seek information going forward. The plaintiffs seek to engage in speech that has yet to occur, bearing on the 2010 elections in Maine. *See* Complaint ¶¶ 86-90.

Nonetheless, the requests are overbroad to the extent that they seek information from January 1, 2008. The same-sex marriage law, which triggered NOM's involvement in the Maine people's veto referendum, was not signed into law until May 6, 2009. Even granting, as the defendants suppose, that "NOM and other groups were likely active in Maine prior to that date since the legislation was well-publicized as it worked its way through the Legislature[,]" Defendants' Initial Brief at 5, the defendants offer no reason to believe that there was any relevant activity prior to 2009.

### B. Objection on First Amendment Privilege Basis, Second RFP No. 1

The plaintiffs also object on a second basis to Second RFP No. 1, insofar as responsive documents contain information identifying NOM's donors: that "[d]isclosure of personal donor information could subject NOM and its donors to harassment and other negative consequences, which could have a chilling effect on NOM's donations and activities." Plaintiffs' Second RFP Response No. 1. In support of that objection, the plaintiffs rely heavily, as they did in asserting a similar objection in an earlier discovery dispute, on *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010), *petition for cert. filed*, 78 U.S.L.W. 3612 (U.S. Apr. 5, 2010) (No. 09-1210). *See* Plaintiffs' Initial Brief at 3-8; *see also* Report of Hearing and Order re: Discovery Dispute and Scheduling (Docket No. 42). However, in this instance, they adduce evidence in support of their assertion of chilling effect in the form of the Blom and Brown declarations, the affidavits of

Bernatche, Elder, Hannemann, Jones, and Morse, and an excerpt from the Blom deposition transcript.

For the reasons that follow, I conclude that, even taking into account the plaintiffs' evidence and additional arguments, they fail to make the requisite *prima facie* showing of arguable First Amendment infringement. Accordingly, their objection on this ground is **OVERRULED**.

In *Perry*, the Court of Appeals for the Ninth Circuit laid out a two-part framework for analysis of claims of First Amendment privilege in response to a discovery request. *See Perry*, 591 F.3d at 1160-61. That framework is consistent with one employed by the First Circuit in similar circumstances in *United States v. Comley*, 890 F.2d 539, 543-44 (1st Cir. 1989). In accordance with that framework:

> The party asserting the privilege must demonstrate a *prima facie* showing of arguable first amendment infringement. This *prima facie* showing requires [that party] to demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights.
>
> If [that party] can make the necessary *prima facie* showing, the evidentiary burden will then shift to the government to demonstrate that the information sought through the discovery is rationally related to a compelling governmental interest and the least restrictive means of obtaining the desired information.

*Perry*, 591 F.3d at 1160-61 (citations, internal punctuation, and footnote omitted); *see also Comley*, 890 F.2d at 543-44.

Bernatche, Elder, Hannemann, Jones, and Morse all aver that they made a donation to the Stand for Marriage Maine PAC to help promote a "yes" vote on referendum ballot question #1 to repeal Maine's gay-marriage law, that they subsequently learned from a Google search that identifying information (for example, names and addresses) had been included in a "Red-Hot

5

Bigot List" on a "Lavender Newswire" web site, that this has caused distress and fear of reprisal, and that they either will not donate to any controversial referendum causes in the future, will think long and hard before doing so in the future, or would not have donated to the Stand for Marriage Maine PAC had they known their information was going to be publicly released. *See generally* Bernatche Aff.; Elder Aff.; Hannemann Aff.; Jones Aff.; Morse Aff.

In the provided excerpt from his deposition transcript, Blom, the executive director of plaintiff American Principles in Action ("APIA"), states that disclosing donor information would have a "very chilling effect" on APIA's ability to raise funds, citing as an example aggressive donor harassment in California on the gay-marriage issue. *See* Blom Dep. at 121. He points out that people have demonstrated in front of donors' homes, although not to date in front of APIA donors' homes. *See id*. at 122.

Yet, in the circumstances of this case, this evidence does not demonstrate that enforcement of this particular discovery request would cause these sorts of chilling effects. On February 16, 2010, this court entered a consent confidentiality order providing, *inter alia*, that documents designated confidential and subject to protective order, as the financial documents sought through Second RFP No. 1 presumably would be, cannot be used or disclosed by the parties, counsel for the parties, or other persons to whom limited third-party disclosure is permitted, for any purpose whatsoever other than to prepare for and to conduct discovery and trial in this action, including any appeal thereof. *See* Consent Confidentiality Order ("Confidentiality Order") (Docket No. 49) ¶ 5(a). Unless otherwise agreed or ordered, the Confidentiality Order is to remain in force after dismissal or entry of final judgment not subject to further appeal. *See id*. ¶ 11(a). Thus, the Confidentiality Order effectively would prevent the occurrence that Blom and the affiants describe as having a chilling effect on a willingness to

6

donate: the public release of donor identifying information, leading to negative repercussions such as picketing in front of donors' houses, and publication of personal donor information on hostile web sites.[2]

While the declarations of Blom and his counterpart Brian Brown, the executive director of NOM, are more to the point, they, too, fall short of making the requisite showing. Blom and Brown express their belief, based on their personal experience soliciting funds for the plaintiff organizations, APIA and NOM, that disclosing personal donor information in the instant case and/or to the Maine Commission on Governmental Ethics and Election Practices ("Commission"), even with limitations on disclosure, would have a "substantial negative effect" on their ability to raise funds because same-sex marriage is a highly controversial issue, many potential donors would hesitate to give funds if they thought that their donation would have to be publicly disclosed, and no donor wishes to become involved in litigation, which can entail being forced to testify, submit to questioning, or otherwise be investigated. *See* Blom Decl. ¶ 4; Brown Decl. ¶ 4. They state that if either APIA or NOM were required to turn over personal donor information, that would lead to a reduction in donations, as potential donors would be reluctant to support a controversial activity that could subject them to government scrutiny. *See id*.

The plaintiffs argue that, as in *Perry* and *Dole v. Service Employees Union*, 950 F.2d 1456, 1459-61 (9th Cir. 1991), the Blom and Brown declarations suffice to make a *prima facie* showing of chill even taking into account the protections of the Confidentiality Order. *See* Plaintiffs' Initial Brief at 3-4. Yet, Blom's and Brown's declarations, which convey their beliefs as to how donors to their organizations would respond, differ in kind from the evidence at issue

---

[2] Moreover, Blom described the experience of donors to organizations other than APIA, *see* Blom Dep. at 121-22, and Bernatche, Elder, Hannemann, Jones, and Morse donated to the Stand for Marriage Maine PAC, which is not a plaintiff in this case.

7

in *Perry* and *Dole*, in which those whose information was proposed to be shared detailed the impact of the anticipated disclosure on them personally.  *See Perry*, 591 F.3d at 1152, 1163 (proponent of California's Proposition 8, who had been served a request for production of documents seeking, among other things, production of his internal campaign communications relating to campaign strategy and advertising, submitted declaration stating that enforcement of the discovery request would drastically alter how he communicated in the future and that he would be less willing to engage in such communications knowing that his private thoughts and views might be disclosed because of his involvement in a ballot initiative campaign); *Dole*, 950 F.2d at 1460 (union submitted letters of two members stating that they would no longer attend meetings given the invasion of privacy entailed in court-ordered turnover of union meeting minutes to U.S. Department of Labor).

      Moreover, the court in *Dole* emphasized that "[t]he record must contain objective and articulable facts, which go beyond broad allegations or subjective fears."  *Id*. (citation and internal quotation marks omitted).  The court had reversed a previous ruling in the union's favor on the ground that an affidavit of a union attorney, stating that unrestricted administrative review of union meeting minutes would chill the exercise of the union's and its members First Amendment rights, "contained bare allegations of possible first amendment violations insufficient to justify judicial intervention into a pending investigation rather than objective and articulable facts."  *Id*. at 1458-59 (citation and internal punctuation omitted).  *See also, e.g., Comley*, 890 F.2d at 544 ("[F]or the most part, Comley has made only general allegations concerning the harassment or harm that will result to his associates if their identities indeed are revealed by the tape recordings.").  The Blom and Brown affidavits suffer from similar flaws: they are speculative and contain general allegations.

My determination that the plaintiffs' evidence falls short of meeting standards set forth in *Perry* and *Comley* does not end the necessary analysis. The plaintiffs offer several arguments to the effect that the chilling effect of which they complain is self-evident and/or their circumstances warrant application of a more lenient evidentiary standard. They contend that:

1. The very fact that one of the plaintiffs currently is being investigated by the state in connection with the activities at issue here is sufficient to establish a *prima facie* case for privilege. *See* Plaintiffs' Initial Brief at 4 (citing *In re Grand Jury Proceeding*, 842 F.2d 1229, 1236 (11th Cir. 1988)).

2. In any event, the threat of being drawn into the Commission's investigation, and being subjected to potential burdens such as having to be deposed, testify in court, or otherwise drawn into litigation, has a clear and obvious chilling effect on First Amendment rights. *See id*. Even the Supreme Court recently noted the prevalence of harassment of opponents of same-sex marriage. *See id.* at 4-5 (citing *Citizens United v. Federal Election Comm'n*, 130 S. Ct. 876, 916 (2010)). The court should take into account the reasonable and predictable consequences of disclosure. *See id.* at 5 (citing *Perry*; *Pollard v. Roberts*, 283 F. Supp. 248, 258 (E.D. Ark.), *aff'd*, 393 U.S. 14 (1968)).

3. The court should take into account the inherent difficulty of producing specific evidence of chill in certain cases. *See id.* The plaintiffs are unable to produce more direct evidence of chill because of the "Catch-22" position in which it would place their donors: to demonstrate their fear of becoming drawn into litigation, donors would have to become drawn into litigation. *See id*. at 5-6.

With respect to the first point, the case on which the plaintiffs rely, *In re Grand Jury*, does not persuade me that it is appropriate to dispense with the type of evidentiary showing

9

contemplated in *Perry* and *Comley* or apply a more lenient standard than envisioned in those cases.  First, the *In re Grand Jury* court's observations regarding the showing necessary to demonstrate infringement of freedom of association was dictum: the court ultimately assumed, *arguendo*, that such a showing had been made.  *See In re Grand Jury*, 842 F.2d at 1236.  Second, the facts of *In re Grand Jury* are distinguishable.  In that case, an organization sought to quash a federal grand jury subpoena *duces tecum* seeking records disclosing the names and addresses of its members that was issued in connection with an investigation into possible criminal violations of the tax laws.  *See id*. at 1230.  The *In re Grand Jury* court observed that relevant caselaw "suggest[ed] that when a government investigation into possible violations of law has already focused on a particular group or groups, the showing required to establish an infringement of freedom of association" was more lenient than normally required, "on the rationale that the government investigation itself may indicate the possibility of harassment."  *Id*. at 1236 (footnote omitted).

Here, while it is true that NOM is under investigation by the Commission for possible violation of Maine's BQC laws, the discovery request in issue seeks financial records for purposes of defending against a suit challenging the constitutionality of Maine laws, not for purposes of a criminal investigation potentially targeting NOM's or APIA's donors.  The rationale of the *In re Grand Jury* dictum does not apply on the facts of this case.

Moreover, to the extent that the plaintiffs argue that donors would fear being drawn into the Commission's investigation of NOM, *see* Plaintiffs' Initial Brief at 4, they overlook the fact that the Confidentiality Order forbids use or disclosure of confidential information by parties, counsel for the parties, and other identified persons (among them Commission employees, *see* Confidentiality Order ¶ 5(b)(2)) "for any purpose whatsoever other than to prepare for and to

conduct discovery and trial in *this action*, including any appeal thereof[,]" *id*. ¶ 5(a) (emphasis added).  If the plaintiffs make full use of the protective provisions of the Confidentiality Order, the defendants will be precluded from using or disclosing any information revealed in response to Second RFP No. 1 to draw NOM's or APIA's donors into the Commission's investigation.

With respect to the second point, I am not persuaded that it is appropriate to deem the claimed chilling effect self-evident.  As discussed above, in view of the protections afforded by the Confidentiality Order, the prospect that donors would be drawn into the *Commission* investigation as a result of disclosures made in response to Second RFP No. 1 is not self-evident: to the contrary, it is highly unlikely.  It is true that disclosure of names of donors may lead to those donors' involvement as potential witnesses in the *instant* litigation.  Yet, as the defendants observe, *see* Defendants' Initial Brief at 7; Defendants' Responsive Brief at 3, the plaintiffs cite no caselaw holding that the prospect of donors' or members' involvement as witnesses in litigation suffices *on its face* to demonstrate a chilling effect on First Amendment rights, and there is reason to be cautious in adopting such an approach, which seemingly would permit any organization to make a *prima facie* case of chilling effect in the absence of articulable, objective evidence of the same.  I accordingly decline to rule that the plaintiffs are relieved from making the sort of evidentiary showing otherwise clearly contemplated by *Perry* and *Comley*.[3]

---

[3] As the plaintiffs point out, *see* Plaintiffs' Initial Brief at 5, the *Perry* court recognized that the evidence offered by the proponents of Proposition 8, while lacking in particularity, was "consistent with the self-evident conclusion that important First Amendment interests are implicated by the plaintiffs' discovery request."  *Perry*, 591 F.3d at 1163. Yet, as noted above, the evidence offered in this case is weaker than that offered in *Perry*.  In addition, as the defendants underscore, *see* Defendants' Initial Brief at 9, *Perry* concerned the disclosure of internal campaign strategy, *see Perry*, 591 F.3d at 1163, a type of disclosure that arguably has more self-evident chilling effect, even when disclosed to an opposing party pursuant to a confidentiality order, than does the simple disclosure of donors' identities.  The plaintiffs correctly point out that the *Pollard* court required no evidentiary showing of chill, stating: "While there is no evidence of record in this case that any individuals have as yet been subjected to reprisals on account of the contributions in question, it would be naive not to recognize that the disclosure of the identities of contributors to campaign funds would subject at least some of them to potential economic or political reprisals of greater or lesser severity."  *Pollard*, 283 F. Supp. at 258.  However, *Pollard* is distinguishable in that the discovery in question consisted of subpoenas *duces tecum* issued by an Arkansas prosecutor in connection with an
*(continued on next page)*

Nor does the Supreme Court's recent *Citizens United* decision help the plaintiffs. While, in the cited portion of the Court's opinion, the Court did note that examples provided by *amici curiae* of blacklisting, threatening, and targeting for retaliation of donors whose names had been disclosed were "cause for concern[,]" it went on to state that "Citizens United . . . has offered no evidence that its members may face similar threats or reprisals. To the contrary, Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation." *Citizens United*, 130 S. Ct. at 916.[4]

The plaintiffs' final point, that donors face a "Catch-22" problem of being drawn into this litigation in order to demonstrate that they fear being drawn into this litigation, is not without force. Yet, the plaintiffs cite no authority that persuades me that such "Catch-22" difficulties preclude an organization's need to show that "enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Perry*, 591 F.3d at 1160 (citation and internal punctuation omitted). That is particularly true in this context, in which the claimed chilling effect is the prospect of being drawn into litigation commenced by the organizations to which the donors contributed.

---

investigation into suspected criminal violations of state election laws – an investigation that the plaintiffs contended was not genuine but, rather, designed to harass and cause irreparable injury to the state's Republican Party and its contributors and workers. *See Pollard*, 283 F. Supp. at 252. In this case, as noted above, the Confidentiality Order would prevent the Commission from using donor identifying information in the context of its investigation into possible violations of the state's BQC laws.

[4] Justice Thomas dissented from this portion of the Court's opinion, stating that the instances of retaliation described by *amici* "sufficiently demonstrate why this Court should invalidate mandatory disclosure and reporting requirements." *Citizens United*, 130 S. Ct. at 981 (Thomas, J., concurring in part and dissenting in part). While the plaintiffs assert that the Court recognized the prevalence of harassment of opponents of same-sex marriage, *see* Plaintiffs' Initial Brief at 4-5, Justice Thomas' views on the evidentiary showing necessary to demonstrate a chilling effect on First Amendment rights obviously did not prevail.

### C. Asserted Deficiency in Initial Disclosures

In the plaintiffs' initial disclosures pursuant to Federal Rule of Civil Procedure 26(a), dated December 11, 2009, they identified only NOM's executive director, Brian Brown, and APIA's executive director, Andresen Blom, as witnesses "likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]" Fed. R. Civ. P. 26(a); Plaintiffs' Initial Disclosures. They also stated that the defendants already were in possession of all documents on which the plaintiffs intended to rely in support of their claims. *See* Plaintiffs' Initial Disclosures.

The defendants contend that the plaintiffs have a duty to supplement these disclosures to identify and provide contact information for any individuals likely to have discoverable information relating to the plaintiffs' claims that certain of Maine's statutes are unconstitutional as applied to NOM and APIA based on the alleged reasonable probability that donors will experience harassment, retaliation, or social ostracism if their identities are disclosed in campaign finance reports, as alleged in paragraphs 113 and 148 of the operative complaint. *See* Defendants' Initial Brief at 1-2, 10; Complaint ¶¶ 113, 148. They request that the court order the plaintiffs to supplement their initial disclosures pursuant to Rule 26(e) and, to the extent that the plaintiffs fail to do so within one week of the date of such order, bar them, pursuant to Federal Rule of Civil Procedure 37(c), from using additional information or witnesses to supply evidence in this case. *See* Defendants' Initial Brief at 1.

These requests are **DENIED** without prejudice on the showing made. The plaintiffs represent that their initial disclosures were complete and correct when mailed on December 11, 2009, and that they have not subsequently learned that those disclosures are incomplete or incorrect, requiring supplemental disclosure pursuant to Rule 26(e). *See* Plaintiffs' Initial Brief

at 8-9; Fed. R. Civ. P. 26(e)(1).  They do state that, depending on the resolution of their pending discovery appeal to the First Circuit, they may wish to rely on additional witnesses or documents in support of their claims.  *See id*. at 9.  Presumably, any such additional witnesses are donors with respect to whose identities the plaintiffs have raised claims, in different contexts, of First Amendment privilege, and such documents contain donor identifying information.  If and when the plaintiffs do name additional witnesses and/ or produce additional documents, the defendants are free to seek relief as to those specific witnesses and/or documents pursuant to Rule 37.

## II.  Conclusion

For the foregoing reasons, I **SUSTAIN** in part and **OVERRULE** in part the plaintiffs' objections on relevance grounds to Second RFP Nos. 1 through 3, **OVERRULE** their objection on First Amendment grounds to Second RFP No. 1, and **DIRECT** them to produce documents responsive to Second RFP Nos. 1, 2, and 3, as those requests are herein modified, within seven days of the date hereof.  I also **DENY**, without prejudice on the showing made, the defendants' request to order the plaintiffs to supplement their initial disclosures and to bar them from using additional witnesses or documents to the extent that such supplementation is not made.

Dated this 23rd day of May, 2010.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge