# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| NATIONAL ORGANIZATION FOR MARRIAGE AND AMERICAN PRINCIPLES IN ACTION,<br><br>PLAINTIFFS<br><br>v.<br><br>WALTER F. McKEE, *in his official capacity as member of the Commission on Governmental Ethics and Election Practices*, ET AL.,<br><br>DEFENDANTS | CIVIL NO. 09-538-B-H |

## BENCH TRIAL DECISION AND ORDER ON MOTION FOR INJUNCTIVE RELIEF

This case pits an advocacy organization's First Amendment right to engage in political speech free of regulation against the voting public's right to know who is speaking about candidates for state and local office. It comes in the wake of the Supreme Court's recent ruling in <u>Citizens United v. Federal Election Commission</u>[1] that "[g]overnment may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether."[2]

---

[1] 130 S. Ct. 876 (2010).
[2] <u>Id</u>. at 886.

The advocacy organization is the plaintiff National Organization for Marriage ("NOM").[3]  It is a Virginia nonprofit corporation dedicated to the definition of marriage as "the union of one husband and one wife."  NOM contends that Maine laws governing PAC definitions, independent campaign expenditures, and attribution and disclaimer requirements are unconstitutionally vague and overbroad, and that they impose excessive burdens that chill NOM's speech during the period preceding this fall's elections and thereafter.

The defendants are various State officers involved in enforcing Maine election laws.  In defending them from constitutional attack, Maine's Attorney General contends that these laws serve Maine's interest in giving voters information that they need in order to evaluate the content and credibility of the political messages that they receive.

NOM moved for a preliminary injunction against enforcement of the laws and moved to consolidate the preliminary injunction hearing with trial on the merits under Federal Rule of Civil Procedure 65(a)(2).  The Attorney General agreed to the consolidation of the injunction hearing with trial, and the parties have stipulated the factual record to be considered by the court.  The consolidated hearing and trial occurred on August 12, 2010.[4]

---

[3] Although NOM's co-plaintiff, American Principles in Action ("APIA"), is listed as a party on the Second Amended Verified Complaint for the purposes of a constitutional challenge to Maine law governing ballot question committees, only NOM has brought these challenges involving candidate elections.  Therefore, NOM is the sole plaintiff for the purposes of these proceedings.

[4] Since the parties stipulated to the admissible facts and documents, see Stipulated Record of Consolidated Hr'g (Docket Item 157), I heard only argument from NOM and the State at the August 12, 2010, merits proceeding.  The materials constituting the trial record were originally filed under seal.  I had no involvement in what the parties determined the record should be and

*(continued next page)*

I now conclude that under governing Supreme Court precedent, the Maine election law standard applying to expenditures "to influence" or "to influence in any way" an election is unconstitutionally vague, but that the Maine election law statutes otherwise survive the plaintiff's constitutional challenges.

## INTRODUCTION

The claims here come from the Second Amended Verified Complaint that NOM filed on June 25, 2010.[5] NOM seeks a declaratory judgment on the constitutionality of Maine's definitions of "political action committee" ("PAC"), its regulation of "independent expenditures," and its attribution and disclaimer requirements for political messages. NOM also seeks injunctive relief against enforcement of the law.[6]

---

certainly made no ruling that the trial evidence would be sealed. I am not willing to make a First Amendment decision based upon a sealed record. As evidence at trial, the record is now public in precisely the way that it would have been had live witnesses been called to testify. The parties must re-file the trial evidence as unsealed documents, part of the public record, but with any redactions required by Fed. R. Civ. P. 5.2.

[5] The lawsuit as first filed in 2009 dealt with ballot question committees under Maine law. I denied NOM and APIA a temporary restraining order on that subject before 2009's referendum election. See Nat'l Org. for Marriage v. McKee, 666 F. Supp. 2d 193 (D. Me. 2009). After appeals and other delays, summary judgment practice is now underway for the ballot question committee part of the lawsuit. In June 2010, NOM's motion to file a Second Amended Verified Complaint was granted because of new Supreme Court caselaw. As a result, NOM added the candidate election law issues that are the subject of this decision, but that turns out to have been unwise. Even NOM says that "[r]unning the two parts together—even considering the two parts together—creates confusion." Pl.'s Third Prelim. Inj. Reply at 7 (Docket Item 140). NOM requested, and the Attorney General's office agreed, to treat them separately, "including at separate hearings." Id. at 8. By agreement, therefore, and under Federal Rule of Civil Procedure 42(a), I ordered a separate trial on the candidate election issues. I find now that there is no just reason for delay with respect to the candidate election law issues, and direct entry of final judgment on this set of claims, Counts V through VIII, under Federal Rule of Civil Procedure 54(b). The candidate election issues are entirely distinct from the ballot question committee issues that remain. Final judgment as to the candidate election claims will permit an appeal before the 2010 elections.

[6] Specifically, NOM seeks to enjoin enforcement of 21-A M.R.S.A. §§ 1052(5) (PAC definition), 1012(3) and 1052(4) (definitions of "expenditure"), 1053-B (regulation of out-of-state PACs), 1019-B (independent expenditure definition and reporting requirements), 1014 (attribution and
*(continued next page)*

These are my findings of fact and conclusions of law.[7]

**FINDINGS OF FACT**

NOM is a nonprofit 501(c)(4)[8] corporation incorporated in Virginia.[9]  It is dedicated to preserving the "historic definition of marriage" as "the union of one husband and one wife," "the natural family that springs therefrom, as well as the rights of the faith traditions that support and sustain" this conception of marriage.[10]  NOM is religious but non-sectarian and non-partisan, and it is not connected with a political party or individual candidate.[11]

NOM describes itself as providing to the anti-same-sex-marriage movement an "organized, national presence needed to impact state and local politics in a coordinated and sustained fashion."[12]  To this end, NOM "develop[s] political messaging," builds e-mail databases of voters, "provide[s] political intelligence and donor infrastructure," supports education and research on its marriage agenda, and has PACs that "raise funds for direct involvement in targeted races of strategic importance across the country."[13]

---

disclaimer requirements on political messages), and 94-270-001 Me. Code R. §§ 10(2)(B) (definition of "expressly advocate"), 10(3)(A) & (B) (reporting schedules for independent expenditures). Pl.'s Third Mot. for Prelim. Inj. at 52 (Docket Item 115).

[7] As required by Fed. R. Civ. P. 52(a).

[8] 501(c)(4) refers to a provision of the Internal Revenue Code denoting the type of nonprofit organization.

[9] Second Am. Verified Compl. ¶ 6 (Docket Item 114).

[10] Am. & Restated Articles of Incorp. of NOM ¶ 3 (Ex. 1 to Second Am. Verified Compl.) (Docket Item 114-1); Second Am. Verified Compl. ¶ 6.

[11] Second Am. Verified Compl. ¶ 85 (citing 2 U.S.C. § 431(7)).

[12] About NOM Webpage (Dec. 2, 2009) (Ex. 12 to Second Am. Verified Compl.) (Docket Item 114-5).

[13] Id.

NOM receives and spends millions of dollars each year to support its activities.[14]   In 2009, NOM received roughly $8 million in contributions.[15] Approximately $350,000 of its annual budget comes from dues paid by its 35,000 members.[16]   Its budget for 2010 is approximately $13 million,[17] of which "one to two million dollars" and perhaps more will come from "smaller" donors.[18]  It receives donations online as well as through traditional mail and maintains a database of all its donors and donations.[19]   NOM is able to determine what donations are received in response to particular solicitations, using data from companies that it employs to process donations.[20]

NOM has been involved in political activities across the country with respect to its marriage agenda.  In California, NOM formed a PAC specifically to promote and support a state referendum banning same-sex marriage in 2008. It has since formed "NOM California PAC" to "make independent expenditures to support candidates that support traditional marriage and . . . to oppose candidates that support same[-]sex marriage."[21]  NOM formed PACs to support

---

[14] Excerpts from NOM Dep. at 178 ("NOM Dep. A"), May 26 & June 23, 2010 (Docket Item 132); Second Am. Verified Compl. ¶ 92.
[15] Excerpts from NOM Dep. at 235 ("NOM Dep. B"), May 26 & June 23, 2010 (Ex. 1 to Defs.' Mot. to Submit Add'l Evidence (Docket Item 153)) (Docket Item 153-1).
[16] Id. at 234-35.
[17] NOM Dep. A at 212.
[18] NOM Dep. B at 234-35.
[19] Id. at 240-41.
[20] Id. at 162, 255.
[21] NOM Dep. A at 115, 177.  In the inaugural issue of its newsletter in July 2009, NOM described how its "intervention helped change the mind of the voters of California, who reversed their state Supreme Court's ruling that had legalized gay marriage":  "NOM helped survey voters, found out how to explain the pro-marriage message, and played a major role in mobilizing the 'Yes on 8' campaign."  NOM Newsletter at 1 (July 2009) (Ex. 6 to Second Am. Verified Compl.) (Docket Item 114-4); see also id. at 3 (describing NOM as "the largest source of funds for Prop. 8 and a key organizer [of] victory at the polls and now in the court"; summarizing how NOM "helped defeat powerhouse gay activist groups in a special [New Hampshire] Senate race" and is working to "win enough [New Hampshire] legislative seats in
*(continued next page)*

or oppose candidates in New York,[22] New Jersey, and Rhode Island.[23]  In 2009, NOM contributed money to a PAC in New Hampshire to support a candidate for state senate and spent money on its own to educate voters about the candidate's positions.[24]  NOM also supported a candidate in Iowa with independent expenditures ($96,000) in 2009.[25]  In 2010, NOM has spent money in the context of elections in California and Hawaii[26] and has run ads critical of the New Hampshire governor.[27]

In Maine, NOM contributes to PACs but not to candidate committees.[28] In 2009, NOM gave $1.8 million to a committee working to repeal the same-sex marriage law.[29]  In 2010, there are no ballot measures in Maine that NOM seeks to support or oppose, but NOM states that it intends to engage in multiple forms of speech in Maine.[30]  Although it says that its speech will not be "express advocacy," a term that in the election law context means an explicit appeal to vote for or against a particular candidate, it anticipates that some

---

2010 to repeal a recent same-sex marriage law"; and describing NOM's support of a constitutional amendment against same-sex marriage in Iowa).

[22] NOM Dep. A at 117; see also id. at 180-81 ($100,000 independent expenditure to defeat Dede Scozzafava's run for Congress).

[23] NOM Dep. B at 114.  Brian Brown, NOM's Executive Director, serves as treasurer for NOM's New York and New Jersey PACs, a position that gives him control over each committee's activities.  Id. at 119 (stating that Brown "almost always" serves as treasurer of NOM's PACs). He is the chairperson of the PAC in California, a position that gives him control there as well. Id.  NOM does not have a national (i.e., federal) PAC.  Id. at 113.

[24] NOM Dep. A at 181-82; see also Nat'l Strategy for Winning the Marriage Battle at 12 (Dec. 15, 2009) (Ex. 12 to NOM Dep. A) (Docket Item 132-2) ("In New Hampshire, if we can elect a new legislature and governor we can reverse gay marriage quickly, either directly or by a quick referral to a vote by the people in 2011.").

[25] NOM Dep. A at 183; see also Nat'l Strategy for Winning the Marriage Battle at 13 ("[R]eversing gay marriage . . . will require electing a new legislature and then votes in two successive sessions to refer a marriage amendment to a vote of the people.").

[26] NOM Dep. A at 212-14.

[27] Id. at 215.

[28] Second Am. Verified Compl. ¶ 93.

[29] NOM Dep. A at 210-11.

[30] Second Am. Verified Compl. ¶ 86.

speech will be about "clearly identified candidates for state or local offices," will target "the relevant electorate . . . in areas where individuals can vote for the clearly identified candidates," and will occur within sixty days of the general election in November (as well as at other times).[31]  But NOM has not identified any specific candidate in Maine that it will support or oppose, has not budgeted any money for the 2010 elections in Maine, and has not identified potential sources of funds to support Maine candidates.[32]  In late 2009, NOM did have general discussions about advertisements for the 2010 elections with an advertising vendor, but the discussions did not involve specific candidates.[33]  Later, Brian Brown, NOM's executive director, discussed at least one candidate with the vendor, but by June 2010, he could not remember her name.[34]  He testified at his deposition that he "spoke to counsel[,] and it was clear that there would be hurdles to doing anything" in Maine.[35]  NOM did have the vendor create three templates for ads for unnamed legislators that are

---

[31] Id. ¶¶ 87-89.

[32] NOM Dep. A at 220-22.  The Commission notes that Brown stated in his deposition that NOM "might support Bob Emrich," apparently "unaware that Mr. Emrich lost his primary race earlier in June and was no longer a candidate."  Defs.' Opp'n to Pl.'s Third Mot. for Prelim. Inj. at 131 (Docket Item 131).  The actual exchange during the deposition was more complicated.

> A. I've spoken with Bob Emrich about races that he thinks are important races in private conversations.  So we've discussed in general some candidates and some individuals.
> Q. Is Mr. Emrich running?
> A. He is running.
> Q. Does NOM plan to spend money to support Mr. Emrich's candidacy?
> A. We don't plan on supporting anyone's—if—if—if we win the lawsuit, then possibly yes.

NOM Dep. A at 221.

[33] Id. at 222.

[34] Id. at 223.

[35] Id.

designed to be run immediately before the November 2010 election.[36] Brown testified that until the laws at issue in this case are changed, NOM is "not going to expend precious resources creating a list of targeted races,"[37] but if NOM wins this lawsuit, it "possibly" may support a campaign.[38] Brown did state, however, "We would like to be able to run these ads."[39] NOM says that each communication it makes costs more than $250.[40]

The Commission is responsible for administering Maine's campaign finance laws and regulations.[41] It receives and monitors campaign finance reports filed by candidates and political committees as well as independent expenditure reports, and it enforces the laws pertaining to attribution and disclaimer statements required on political advertisements and other political communications.[42]

---

[36] Id. at 227, 229. For example, a broadcast ad would say:

> "Legislator X" helped push same-sex marriage through the Maine legislature. During the debate, Legislator X slammed supporters of traditional marriage. What Legislator X didn't tell us is that he/she is a paid consultant for the backers of same-sex marriage. Even now, these backers say they will continue to push the issue. Call Legislator X and tell him/her to respect traditional marriage. Let him/her know it's time to stop pushing to redefine marriage in Maine. Paid for by the National Organization for Marriage.

"Legislator X's Public Service" (Ex. 13 to Second Am. Verified Compl.) (Docket Item 114-6). Another ad discusses school teaching references to gay marriage and concludes by asking the audience to "[c]all Legislator Z and tell him/her: 'Don't mess with marriage.' Call him/her at ____. Ask your state legislators if they support marriage only between one man and one woman." "Consequences" (Ex. 14 to Second Am. Verified Compl.) (Docket Item 114-7). NOM has a separate postcard mailer praising "Legislator Y" for being a "strong pro family, pro-child leader," an "effective fiscal conservative," and a "champion for lower taxes and more government accountability" and urging the recipient to thank "him/her for his/her dedicated public service." NOM Issue Mailer, "Thank You, Legislator Y," Jumbo Postcard Self-Mailer (Ex. 15 to Second Am. Verified Compl.) (Docket Item 114-8).

[37] NOM Dep. A at 219.

[38] Id. at 221.

[39] Id. at 227. At trial, NOM's attorney confirmed NOM's intention to run the three ads.

[40] Second Am. Verified Compl. ¶ 92.

[41] Second Wayne Aff. ¶ 3 (Docket Item 133).

[42] Id.

The Commission maintains an electronic filing system that allows those filing campaign finance reports to enter data remotely and to upload contribution and expenditure data saved in common consumer program formats, eliminating the need to enter the data into the Commission's forms.[43] For certain expenditure reports, a filer need provide only the date, amount, payee name and address, and purpose.[44]

The Commission has calculated that in 2008, the average costs in Maine of a contested general election campaign for State Representative and for State Senate were $5,370 and $23,193, respectively.[45]

The Commission's website provides the public with information about which organizations are spending money to influence Maine voters in selecting candidates, the sources of funding for these organizations, how much money organizations are spending, and the identities and locations of the organizations' primary decision-makers, officers, and fundraisers.[46] This information also allows the public to determine whether a PAC is "supported by organized labor, trade associations, business groups, or particular social groups, which could indicate that the [PAC] shares the viewpoints of those donors."[47] In particular, voters can learn what national constituencies are supporting a candidate, because the Commission provides information about PACs "that are involved in political campaigns in many states and thus do not

---

[43] Id. ¶ 28.
[44] Id. ¶ 29.
[45] Id. ¶ 33.
[46] Id. ¶ 37.
[47] Id. ¶ 40. This information can help alleviate confusion created by the names of PACs. Id. ¶ 38.

have as their major purpose influencing Maine candidate races or ballot question campaigns" but spend "significant sums" to influence elections in Maine.[48]

The Commission also uses information from PAC and independent expenditure reports to administer the Maine Clean Election Act (Maine's public funding mechanism) and Maine's limits on contributions to candidates.[49]

The Commission provides advice to potential campaign finance filers about whether they must file reports.[50]  For example, the Commission has advised filers that "determination of whether the communication constitutes express advocacy will be based on the entire content of the communication, and whether the communication has any reasonable meaning other than to urge the election or defeat of a candidate."[51]

## CONCLUSIONS OF LAW

This court has original jurisdiction over cases involving challenges to State law under the First and Fourteenth Amendments to the United States Constitution.[52]  If the plaintiff establishes an "actual controversy" and prevails on the merits of its claims, the court has the power to grant declaratory relief[53] or to issue a permanent injunction if the plaintiff also shows "(1) that it has

---

[48] Id.  ¶ 41 (listing the Democratic Governors Association and the Republican Governors Association as examples of national groups without their major purpose in Maine that seek to affect the outcome of Maine elections).  Independent expenditure reports serve a similar purpose as do the attribution and disclaimer requirements for certain political messages.  Id. ¶¶ 47-51.
[49] Id. ¶¶ 63-64.
[50] Id. ¶¶ 70-72.
[51] Id. ¶ 72.
[52] 28 U.S.C. § 1331.
[53] Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 39 (1st Cir. 2006) (citing 28 U.S.C. §§ 2201-2202).

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[54]   This four-part test is, however, something of a formality in First Amendment cases given the clear irreparable harm caused by censorship, the hardship that censorship imposes on citizens, and the strong public interest in upholding constitutional rights.[55]

## A.   *Summary of Challenged Portions of Maine Election Law*

### 1.   *PACs*

Under Maine law, an organization has to register as a PAC if it either (a) has the "major purpose" of "initiating, promoting, defeating or influencing" a candidate election and spends more than $1,500 in a year for that purpose; or (b) does not have such a "major purpose" but spends more than $5,000 in a year "for the purpose of promoting, defeating or influencing in any way the nomination or election of any candidate to political office."[56]   At oral argument, the Attorney General's office told me that it has no basis to believe that NOM's major purpose is to promote or defeat a candidate election in Maine, and in light of the record evidence about NOM's nationwide activities, I conclude that there would be no basis for doing so.   As reflected on this record, NOM is not a

---

[54] Shell Co. (P.R.) v. Los Frailes Serv. Station, 605 F.3d 10, 19 (1st Cir. 2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

[55] See Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla, 490 F.3d 1, 21 (1st Cir. 2007) (loss of First Amendment freedoms "unquestionably constitutes irreparable injury" and the balance of equities and the public interest favor permanent relief (citation omitted)).

[56] 21-A M.R.S.A. §§ 1052(5)(A)(4), 1052(5)(A)(5), 1053.

major-purpose PAC under Maine law, and I do not pursue that statutory provision further.

An organization treated as a non-major-purpose PAC must register within seven days of making the requisite $5,000 expenditures.[57]  The general definition of "expenditure" is the "purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value, made for the *purpose of influencing* the nomination or election of any person to political office" or "for the *initiation, support or defeat* of a campaign, referendum or initiative" in Maine.[58]  However, the non-major-purpose PAC definition limits the general "expenditure" definition to spending "for the purpose of *promoting, defeating or influencing in any way* the nomination or election of any candidate to political office."[59]  Registration does not impose any limits on how much the organization can raise or spend independently of a candidate, but it does require disclosures and recordkeeping.  When initially registering, the organization must identify its form of organization; provide a name and mailing address; name its treasurer; identify its principal officers, primary fundraisers, and decision makers; and indicate which Maine candidates or committees it supports or opposes.[60]  Thereafter, it must file reports about its spending on a quarterly basis, as well as eleven days before and forty-two days after an election, and, if it makes expenditures over $500 within fourteen days of an

---

[57] 21-A M.R.S.A. § 1053.
[58] 21-A M.R.S.A. § 1052(4)(A) (emphasis added).
[59] 21-A M.R.S.A. § 1052(5)(A)(5) (emphasis added).
[60] 21-A M.R.S.A. § 1053.

election, within twenty-four hours after that expenditure.[61]  It does not have to set up separate bank accounts or a separate corporate structure, but it must maintain detailed records for four years.[62]  Although a major-purpose PAC must report all expenditures, including operational expenses, a non-major-purpose PAC need report only "expenditures made for the purpose of promoting, defeating or influencing a ballot question or the nomination or election of a candidate to political office."[63]

PACs from other states can contribute to candidates, party committees, and Maine PACs without registering unless they accept contributions to "*influence* an election" in Maine.[64]  However, if they do accept such contributions or otherwise satisfy the requirements of the Maine PAC definitions,[65] they must register with the Commission.

Failure to register can be punished by a civil fine of $250.[66]  An organization that is treated as a PAC and fails to file timely expenditure reports can be assessed a fine up to $10,000 and if it fails to file reports at all can be charged with a misdemeanor or, alternatively, assessed a civil penalty up to $10,000.[67]

---

[61] 21-A M.R.S.A. § 1059(2) (except on Election Day).
[62] 21-A M.R.S.A. § 1057.
[63] 21-A M.R.S.A. § 1060(7).  The candidate-related expenditures must be itemized and detailed. 21-A M.R.S.A. § 1060(4).
[64] 21-A M.R.S.A. § 1053-B (emphasis added).
[65] 21-A M.R.S.A. § 1052(5).
[66] 21-A M.R.S.A. § 1062-A(1).
[67] 21-A M.R.S.A. §§ 1062-A(8), (8-A).

## 2. Independent Expenditures

A person or group that makes expenditures exceeding $100, independently of a candidate, for "any communication that expressly advocates the election or defeat of a clearly identified candidate" must file a report with the Commission.[68] While Maine election laws generally define "expenditure" as including a "purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value made *for the purpose of influencing* the nomination or election of any person to political office,"[69] the language of the independent expenditure provision is more limited. It explicitly applies only to expenditures made for the purpose of express advocacy.[70] Maine regulations define the statutory language "expressly advocates" to mean the use of phrases such as "vote for the Governor," "reelect your Representative," and "'vote Pro-Life' or 'vote Pro-Choice' accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice."[71] The regulations also include slogans or

---

[68] 21-A M.R.S.A. § 1019-B(1)(A). The statute's reference to a "clearly identified candidate" effectively limits its applicability to the window created by a candidacy for political office in Maine. See 21-A M.R.S.A. § 1012(1). The reports must include "an itemized account of each expenditure aggregating in excess of $100 in any one candidate's election, the date and purpose of each expenditure and the name of each payee or creditor," 21-A M.R.S.A. § 1019-B(3)(B), and must state whether "the expenditure is in support of or in opposition to the candidate" and whether "the expenditure is made in cooperation, consultation or concert with, or at the request or suggestion of, the candidate or an authorized committee or agent of the candidate," 21-A M.R.S.A. § 1014. Because an independent expenditure report requires a sworn statement, a filer must use a paper form. See Wayne Aff. ¶ 8. Reports must be filed on a quarterly schedule so long as the aggregate expenditures are less than $250 per candidate and are not made within fourteen days of an election. For the latter, they must be reported with twenty-four hours. 94-270-001 Me. Code R. § 10(3)(A). Those making independent expenditures must also file a pre-election report fourteen days before the election. Id. Once aggregate expenditures per candidate total more than $250, all further expenditures must be reported within twenty-four hours. 94-270-001 Me. Code R. § 10(3)(B). Since NOM's communications all cost more than $250, the twenty-four-hour requirement would apply to it.

[69] 21-A M.R.S.A. § 1012(3)(A)(1).

[70] 21-A M.R.S.A. § 1019-B(1)(A).

[71] 94-270-001 Me. Code R. § 10(2)(B).

words that "in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates, such as . . . advertisements [that] say 'Pick Berry,' 'Harris in 2000,'" etc.[72]

For races involving a certified Maine Clean Election Act candidate, there is an additional provision: an expenditure "made to design, produce or disseminate a communication that names or depicts a clearly identified candidate" and that is disseminated within twenty-one days of a primary or thirty-five days of a general election is statutorily *presumed* to be an independent expenditure.[73] But the presumption can be rebutted by submission to the Commission, within forty-eight hours of the expenditure, of a statement that the "cost was not incurred with the intent to influence the nomination, election or defeat of a candidate."[74] Once the presumption is defeated, the Commission must determine by a preponderance of the evidence whether the expenditure was intended to influence the nomination, election or defeat of a candidate and can gather other information to do so.[75]

Failure to abide by the independent expenditure reporting requirements can result in a civil penalty of up to $5,000.[76]

### 3. Attribution/Disclaimer Requirements for Political Messages

A communication made within twenty-one days of a primary or thirty-five days of a general election that names or depicts a clearly identified candidate, even if it does not advocate election or defeat, must state "the name and

---

[72] Id.
[73] 21-A M.R.S.A. § 1019-B(1)(B).
[74] 21-A M.R.S.A. § 1019-B(2).
[75] Id.
[76] 21-A M.R.S.A. § 1020-A(5-A)(A).

address of the person who made or [made expenditures for] the communication and [whether] the communication was or was not authorized by the candidate"—unless "the communication was not made *for the purpose of influencing* the candidate's nomination for election or election."[77]   Failure to abide by these disclosure requirements can subject a person or organization to civil fines.[78]

**B.      *Justiciability***

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies,'" and a "controlling element[ ] in the definition of a case or controversy under Article III is standing."[79]   To establish constitutional standing, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."[80]   Standing also has prudential requirements.   A plaintiff cannot litigate another's rights or seek redress of a generalized political grievance and must fall within the "zone of interests" implicated by the law at issue.[81]

In First Amendment cases, some of the prudential requirements for standing are relaxed.   A person need not "expose herself to arrest or prosecution" before bringing a First Amendment challenge to a statute because "a credible threat of present or future prosecution itself works an injury that is

---

[77] 21-A M.R.S.A. § 1014(2-A) (emphasis added).
[78] 21-A M.R.S.A. § 1014(4).
[79] Hein v. Freedom from Religion Found., Inc., 551 U.S. 587, 597-98 (2007) (citations omitted).
[80] Id. (citation omitted).
[81] Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005).

sufficient to confer standing, even if there is no history of past enforcement,"[82] namely, self-censorship.[83]  NOM argues correctly that the threat of prosecution and conviction of a misdemeanor for violating Maine's PAC laws is sufficient to chill expression protected by the First Amendment.[84]  NOM explains that its "injury is the chill to speech caused by [the] prospective enforcement of Maine law or prosecution of NOM."[85]  The standard for showing such an injury is "not very demanding"—"the record must contain evidence sufficient to indicate an objectively reasonable possibility that [a plaintiff] would be subject to the allegedly unconstitutional [law]."[86]  Moreover, in some cases a person who faces cognizable injury can also raise a First Amendment challenge to a law that would restrict the speech of others.[87]

But, "[v]irtually by definition, the threat of self-censorship cannot exist if a party has no intention either of speaking or otherwise exposing herself to [prosecution]."[88]  Prudential standing concerns are "relaxed" where the First Amendment is concerned, but constitutional standing requirements are not eliminated.[89]  A plaintiff must show that it "has sustained or is immediately in danger of sustaining some direct injury . . . [that is] both real and

---

[82] N.H. Right to Life PAC v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996) (citations omitted).

[83] Id. at 14 ("[I]t poses a classic dilemma for an affected party: either to engage in the expressive activity, thus courting prosecution, or to succumb to the threat, thus forgoing free expression. Either injury is justiciable.").

[84] Pl.'s Reply at 3.

[85] Pl.'s Reply at 4 (citing N.H. Right to Life PAC, 99 F.3d 8).

[86] Osediacz, 414 F.3d at 143 (citation omitted).  I agree with NOM that assurances by state officials not to enforce the law would not destroy standing and that NOM is not required to go to a state forum or to seek advice from state enforcement authorities.  See Pl.'s Reply at 5.

[87] See Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2719 (2010).

[88] Osediacz, 414 F.3d at 141.

[89] Id.; see also Ramirez v. Ramos, 438 F.3d 92, 98-99 (1st Cir. 2006) ("The evidentiary threshold that must be crossed in order to establish a credible threat is modest, but it is real." (citation omitted)).

immediate."[90]  That is the standing issue here.  Since we are well past the pleading stage and have completed trial on the merits, the standing issue must be determined from the record by a preponderance of the evidence.[91]  That includes the admissible allegations of the Second Amended Verified Complaint and the other evidence stipulated into the record.

What that record reveals is that NOM has endorsed no one, does not currently plan to make expenditures, and did not even budget for expenditures in this Maine election cycle.  But the reasons for that lack of action are the requirements of Maine law.  NOM says that it will not "get involved in races" unless Maine law "is changed."[92]  In fact, the record does show that NOM has developed model advertisements and that each communication it makes costs more than $250.[93]  The Second Amended Verified Complaint (verified by NOM's executive director who certainly has knowledge of the relevant information) states explicitly that "NOM seeks in 2010 to engage in multiple forms of speech in Maine, including radio ads, direct mail, and publicly accessible Internet postings of its radio ads and direct mail" and that it will run some of that

---

[90] Ramirez, 438 F.3d at 97; see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (injury in fact must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'" (citations omitted)).

[91] See Lujan, 504 U.S. at 561 ("[Standing is] not [a] mere pleading requirement[] but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. . . .  [A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" (citations omitted)).

[92] See NOM Dep. A at 219.

[93] The record is more ambiguous on whether NOM meets the PAC spending threshold.  NOM says that "[t]o pay for its speech, NOM receives and spends more than $5000 in each calendar year."  Second Am. Verified Compl. ¶ 92.  But the statutory definition is more than $5,000 received or spent in a calendar year "for the purpose of promoting, defeating or influencing in any way the nomination or election of any candidate to political office."  21-A M.R.S.A. § 1052(5)(A)(5).

speech in the thirty-five days before the general election.[94]   Although this showing certainly could have been stronger, I conclude that NOM's showing surpasses the insufficient showing in <u>Osediacz</u> where the plaintiff merely was unhappy with the law in question, but expressed no desire to engage in expressive activity herself.[95]   I conclude that NOM has expressed the desire to engage in expressive activity that could "influence" an election.   "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."[96]   I therefore find by a preponderance of the evidence that NOM has standing.

**C.**    ***Substantive Challenges***

NOM challenges Maine's PAC definition, the independent expenditure requirements, and the attribution/disclaimer requirements as unconstitutional, claiming that they are vague, overbroad, and burdensome.

Just days before NOM filed its preliminary injunction papers, the Supreme Court clarified the relationship between the constitutional concerns of vagueness and overbreadth in <u>Holder v. Humanitarian Law Project</u>.[97]   The Court explained that vagueness is a due process challenge:  a law violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously

---

[94] Second Am. Verified Compl. ¶¶ 87-89.
[95] 414 F.3d at 141-42.
[96] <u>N.H. Right to Life PAC</u>, 99 F.3d at 15.
[97] 130 S. Ct. 2705 (2010).

discriminatory enforcement."[98]  When a statute interferes with freedom of speech, "a more stringent *vagueness* test should apply."[99]  This means that a statute interfering with expressive acts must give more than "fair notice" (although "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").[100]  But if the speech is "clearly proscribed," then there is no successful *vagueness* claim for lack of notice.[101]  If the challenge concerns the speech of others or speech other than what the organization proposes as its speech, then that is an overbreadth claim under the First Amendment, not part of a due process challenge.[102]  I shall use the terms as the Supreme Court did in <u>Humanitarian Law Project</u>.

One final point deserves attention.  Maine election laws do not ban speech.  What they do is create certain consequences for organizations that qualify as PACs, such as registration and reporting, and attribution, disclosure, and reporting requirements on independent expenditures.  United States Supreme Court decisions dealing with these types of disclosure requirements are more approving and less demanding than decisions dealing with outright prohibition of speech.

### 1.  *Maine's PAC Law*

NOM challenges Maine's definition of when an organization becomes a PAC.  NOM says that it does not challenge the disclosure requirements for

---

[98] <u>Id</u>. at 2718 (citation omitted).
[99] <u>Id</u>. at 2719 (quoting <u>Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 499 (1982)).
[100] <u>Id</u>.
[101] <u>Id</u>.
[102] <u>Id</u>.

PACs, but only the definition that includes NOM, because the definition is unconstitutionally vague, includes speech that is not properly subject to regulation, and imposes impermissible burdens.[103]

### a. *Vagueness*

Does Maine law give NOM adequate notice of whether its activities will make it a non-major-purpose PAC? Leaving aside the fact that NOM has not alleged precisely that it will spend enough money to trigger the statute's application,[104] the question is whether NOM can tell that paying for the three ads that it intends to run amounts to an expenditure for the purposes of "promoting, defeating or influencing in any way the nomination or election of any candidate."[105]

The Supreme Court has stated that the "words 'promote,' 'oppose,' 'attack,' and 'support' clearly set forth the confines within which . . . speakers must act in order to avoid triggering [a law]" and that "[t]hese words 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'"[106]   I

---

[103] Pl.'s Reply at 13.

[104] See note 93, supra.

[105] 21-A M.R.S.A. § 1052(5)(A)(5).

[106] McConnell v. FEC, 540 U.S. 93, 170 n.64 (2003) (citation omitted), overruled in part on other grounds by Citizens United, 130 S. Ct. 876; see also United States v. Williams, 553 U.S. 285, 294-95 (2008) (explaining that the verb "promotes" is "susceptible of multiple and wide-ranging meanings" in isolation, but can be narrowed by "the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated" and thus "promotes," "in a list that includes 'solicits,' 'distributes,' and 'advertises,' is most sensibly read to mean the act of recommending[.]" (citations omitted)).

therefore take these words and close equivalents in the Maine statute such as "defeat" to be clear and unambiguous.[107]

That conclusion resolves all but the phrase "influenc[e] in any way."[108] Analysis of that phrase and the statutory use of the term "influence" elsewhere in this case is far more difficult than either party recognizes. For a federal disclosure requirement in the context of independent expenditures, <u>Buckley v. Valeo</u> held that the phrase, "expenditures . . . 'for the purpose of . . . influencing' the nomination or election of candidates for federal office," raised "serious problems of vagueness" because, in political speech, "influence" potentially captures "both issue discussion and advocacy of a political result."[109] Laws may not prohibit issue discussion under the guise of campaign finance reform. As a result, <u>Buckley</u> avoided the unconstitutional vagueness of the term "influence" by interpreting it as limited to express advocacy to elect or defeat a clearly identified candidate.[110] The Fifth Circuit did the same in interpreting use of the term "influence" in a Louisiana election law statute.[111] But the Supreme Court recently clarified that <u>Buckley</u>'s

---

[107] NOM also attacks "initiating" and "initiation," but says only that those terms "fare no better than 'influencing,' 'promoting,' or and 'in support of or in opposition to.'" Second Am. Verified Compl. ¶ 143. Since those terms do not appear in the definition of a non-major-purpose PAC, I do not address them.

[108] It is true that in my ruling denying a preliminary injunction on the ballot question committee issue, I found other provisions that contained the word "influence" to be sufficiently clear. <u>See</u> <u>Nat'l Org. for Marriage</u>, 666 F. Supp. 2d at 210-12. But the focus there was not on "influence" as such, but on the objective standard for determining what a contributor believed.

[109] <u>Buckley v. Valeo</u>, 424 U.S. 1, 76, 79 (1976).

[110] <u>Id</u>. at 80.

[111] <u>See</u> <u>Ctr. for Individual Freedom v. Carmouche</u>, 449 F.3d 655, 665-66 (5th Cir. 2006). I note that the dissent argued that this was improper after <u>McConnell</u> and said that the issue should have been certified to the Louisiana Supreme Court to interpret the Louisiana statute. <u>See</u> <u>id</u>. at 672 (Dennis, J., dissenting). The Second Circuit upheld a law including the phrase "for the purpose of influencing an election" but did not squarely face the issue of vagueness, noting
*(continued next page)*

narrowing interpretation of the term "influence" was federal statutory construction, not a "constitutional test," a "first principle of constitutional law," or "the constitutional standard for clarity in the abstract."[112] Thus, we cannot say that limiting the reach of the Maine statutory term "influence" to "express advocacy" is the *only* way to narrow the term to avoid its unconstitutional vagueness. On the other hand, I observe that Maine's election law seems to have adopted the phrase "for the purpose of influencing the nomination or election of any person to political office" in direct response to <u>Buckley</u>,[113] and thus could be seen as incorporating the <u>Buckley</u> narrowing construction. In a previous case in this court some years ago, Maine's Attorney General did argue that express advocacy was the proper interpretation of that term.[114] Now, however, it does not. Neither has the Attorney General asked that I certify the question to the Maine Law Court for its interpretation. I think it is obvious from <u>Buckley</u> that the "influence" or "influence in any way" test cannot be used—without a narrowing gloss—for determining whether NOM expenditures

---

only that issue had not been raised either below or on appeal and that the phrase had been upheld in <u>Buckley</u>. <u>Landell v. Sorrell</u>, 382 F.3d 91, 136 n.26 (2d Cir. 2002), <u>overruled on other grounds by</u> <u>Randall v. Sorrell</u>, 548 U.S. 230 (2006). Judge Winter dissented, arguing that <u>Buckley</u> held the term impermissibly vague. <u>Id</u>. at 201 (Winter, J., dissenting). The Ninth Circuit upheld a Montana ballot initiative statute that required an intent to "influence an election" but it never discussed the "influence" issue and explicitly did not express a view about "the constitutionality of . . . disclosure requirements in the context of candidate elections." <u>Canyon Ferry Rd. Baptist Church of East Helena, Inc. v. Unsworth</u>, 556 F.3d 1021, 1034 (9th Cir. 2009).

[112] <u>FEC v. Wis. Right to Life, Inc.</u>, 551 U.S. 449, 474 n.7 (2007). That conclusion does not upset the <u>Buckley</u> holding that tying disclosure requirements to expenditures to "influence" an election is unconstitutionally vague.

[113] <u>See</u> 1975 Me. Laws 3456 ("Emergency Preamble. . . . Whereas, the laws on election campaign reports and finances must be revised as a result of the U.S. Supreme Court's decision of January 30, 1976[.]"). <u>Compare</u> 1975 Me. Laws 1855 (§ 1397(5) (effective Jan. 1, 1976)), <u>with</u> 1975 Me. Laws 3457 (§ 1392(4)(A) (effective Apr. 14, 1976)).

[114] <u>Volle v. Webster</u>, 69 F. Supp. 2d 171, 175 (D. Me. 1999).

subject it to the PAC definition.  But no viable, alternative interpretation of that word has been offered to me.[115]  Following Buckley, I find the term "influence" and the phrase "influence in any way" unconstitutionally vague.

Since I find that the Maine statutes are otherwise clear, I conclude that the proper remedy is to sever "influence" (in its several forms) from the challenged statutes.[116]

### b.    Constitutional Test for Non-Vague PAC Regulations

Once the $5,000 spending threshold is reached, Maine would consider NOM subject to the PAC registration, disclosure, and recordkeeping requirements, but would not prohibit NOM's speech.  I therefore determine whether those rules meet constitutional standards.  If they do, there is no need for me to assess into which category—express advocacy or issue advocacy—NOM's intended speech would fall.  (And the rules for that latter determination are clear.  Neither intent nor effect is relevant.[117]  Instead, the test must be objective.[118]  An "ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to

---

[115] The Attorney General has not given me grounds to distinguish Maine's statutory language from the language at issue in <u>Buckley</u> or offered a competing interpretation of the word "influence" in the context of the current Maine statute that could alleviate the vagueness concerns that troubled the Supreme Court.

[116] The "issue of severability . . . is a question of state law."  <u>United States Dep't of Treasury v. Fabe</u>, 508 U.S. 491, 510 (1993).  Under Maine law, an "invalid portion of a statute or an ordinance will result in the entire statute or ordinance being void only when it is such an integral portion of the entire statute or ordinance that the enacting body would have only enacted the legislation as a whole."  <u>Kittery Retail Ventures, LLC v. Town of Kittery</u>, 856 A.2d 1183, 1190 (Me. 2004); 1 M.R.S.A. § 71(8).

[117] <u>Wis. Right to Life, Inc.</u>, 551 U.S. at 467 (citing <u>Buckley</u>, 424 U.S. at 43-44).  Although this portion of the opinion did not command a majority, the Court later characterized it in <u>Citizens United</u> as the "controlling opinion."  130 S. Ct. at 889.  Since intent is not a legitimate measure, I ignore the State's repeated references to NOM's "admitted" purpose in the ads.  <u>See</u> Defs.' Opp'n at 29, 32 n.27.

[118] <u>Wis. Right to Life, Inc.</u>, 551 U.S. at 469.

vote for or against a specific candidate."[119]  The Supreme Court recognizes that "the distinction between campaign advocacy and issue advocacy 'may often dissolve in practical application" because "[c]andidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions.'"[120]  But "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor."[121])

The Supreme Court has made clear that when election-related speech is not prohibited, but simply carries consequences such as these PAC-type requirements, courts must apply "exacting scrutiny" to the law.[122]  That was clear for express advocacy after <u>Buckley</u>.  Now after <u>Citizens United</u> it is clear for issue advocacy as well.  <u>Citizens United</u> rejected the idea that "disclosure requirements must be limited to speech that is the functional equivalent of express advocacy."[123]  The Court stated that even if ads "only pertain to a commercial transaction" and do not engage directly in political speech, government can require disclosure of "who is speaking about a candidate."[124] "The First Amendment protects political speech; and disclosure permits citizens . . . to react to the speech of corporate entities in a proper way."[125] This "exacting scrutiny" standard requires a "substantial relation" between

---

[119] <u>Id</u>. at 469-70.
[120] <u>Id</u>. at 456-57 (citation omitted).
[121] <u>Id</u>. at 474.
[122] <u>Citizens United</u>, 130 S. Ct. at 914.  I reject NOM's argument that "strict scrutiny" applies to the PAC definitions and the expenditure definitions.
[123] <u>Id</u>. at 915.
[124] <u>Id</u>.; <u>see also</u> <u>Buckley</u>, 424 U.S. at 81 ("[D]isclosure helps voters to define more of the candidates' constituencies.").
[125] <u>Citizens United</u>, 130 S. Ct. at 916.  The Court did not limit its discussion of the informational interest to the facts of the case.  <u>See id</u>. at 915.

disclosure requirements and a "sufficiently important" governmental interest.[126]

Disclosure requirements, the Court held as early as 1976 in <u>Buckley v. Valeo</u>, "directly serve substantial governmental interests."[127]   The Supreme Court enumerated the important governmental interests in disclosure:

> The governmental interests sought to be vindicated by the disclosure requirements are of this magnitude.  They fall into three categories.   First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office.   It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches.  The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.   Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.   This exposure may discourage those who would use money for improper purposes either before or after the election.  A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return. . . . Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above.[128]

These same factors apply to state elections.   The D.C. Circuit reiterated their significance in an en banc opinion this year, referring to the "governmental interest in 'provid[ing] the electorate with information' about the sources of political campaign funds, not just the interest in deterring corruption and

---

[126] <u>Id</u>. at 914 (citations omitted).   NOM contends that strict scrutiny applies, based on a misreading of the discussion in <u>Citizens United</u> of PAC disclosure requirements in the context of a total ban on corporate speech.   <u>See</u> Second Am. Verified Compl. ¶¶ 151-52.
[127] <u>Buckley</u>, 424 U.S. at 68.
[128] <u>Id</u>. at 66-68.

enforcing anti-corruption measures."[129]   In that case, the court upheld both independent expenditure disclosure requirements and the organizational requirements that follow treatment as a political committee, finding the latter to be only a minimal added burden.[130]   Maine likewise has a compelling reason for compiling information about PACs—the goal of providing information to Maine voters about the interest groups that spend money referring to candidates in an election—and indeed Maine has polling data demonstrating the public's interest in such information.[131]

As for the "substantial relation" requirement, I conclude that Maine's measures are substantially related to the governmental interests I have described.   They are designed to provide information to the public about the source of monies being spent in an election; and Maine, through its Commission website and otherwise, makes that information easily available to the public.   I find the disclosure, registration, and recordkeeping requirements not unconstitutionally burdensome.[132]   NOM does not have to set up a separate corporation or separate bank accounts.   It is not unusual to require a corporation doing business in a state to identify its organizational form, provide

---

[129] Speechnow.org v. FEC, 599 F.3d 686, 696 (D.C. Cir. 2010) (citation omitted).

[130] Id. at 698.

[131] See Second Wayne Aff. ¶ 52.

[132] I expressed concern in my earlier preliminary injunction ruling over the growth over time of Maine's regulatory requirements, pointing to other cases like Emily's List v. FEC, 581 F.3d 1 (D.C. Cir. 2009) and California Pro-Life Council, Inc. v. Randolph, 507 F.3d 1172 (9th Cir. 2007). See Nat'l Org. for Marriage, 666 F. Supp. 2d at 206 ("Regulation tends to grow and to develop requirements appropriate for large organizations (like these plaintiffs) and to ignore the burdensome effects on the speech of individuals and small organizations.").   Maine would be well-advised to take this concern seriously, particularly in light of the Citizens United majority's description of the onerous burdens of PAC-type registration and recordkeeping. Because of the unique context of Citizens United, where corporate speech was outright prohibited, I do not find those statements dispositive here, but they clearly are a warning shot across the bow for growing bureaucratic regulation in this area.

a name and address, and identify a treasurer and principal officers. Here, in addition, NOM must identify its primary fundraisers and decisionmakers and state which Maine candidates or committees it supports or opposes,[133] hardly a huge burden.[134] Reporting too is not onerous. NOM must report only contributions and expenditures for the promotion or defeat of a candidate (and transfers to other PACs).[135]

Finally on the PAC definitional challenge, NOM argues from <u>Buckley</u> that a state can make these impositions only upon PACs whose major purpose is electing a candidate in Maine.[136] As NOM concedes, however, there is no Supreme Court case applying a so-called "major-purpose test" to the state regulation of PACs.[137] And the Supreme Court has clarified that the part of <u>Buckley</u> upon which NOM relies involved an "intermediate step of statutory construction on the way to its constitutional holding," not "a constitutional test."[138] NOM's desire to limit campaign finance disclosures to "major purpose" groups would yield perverse results, totally at odds with the interest in "transparency" recognized in <u>Citizens United</u>.[139] Under NOM's interpretation, a small group with the major purpose of re-electing a Maine state representative

---

[133] 21-A M.R.S.A. § 1053.

[134] I make this ruling both facially and as applied. It might be argued that organizations of NOM's size and sophistication, in particular, are not burdened. If that were the basis for my ruling, then I would need also to examine overbreadth, to determine the law's impact on small and unsophisticated organizations. <u>See</u> <u>United States v. Stevens</u>, 130 S. Ct. 1577, 1587 (2010) (quoting <u>Wash. State Grange v. Wash. State Republican Party</u>, 552 U.S. 442, 449 n.6 (2008)). But my ruling is not based upon NOM's circumstances.

[135] "Influencing" an election is also included, but I have found that test unconstitutional. To the extent that NOM is an out-of-state PAC under 21-A M.R.S.A. § 1053-B, it must comply with the requirements of § 1053. NOM has not here challenged the contribution definition.

[136] <u>See</u> Second Am. Verified Compl. ¶ 153.

[137] Pl.'s Reply at 14.

[138] <u>Wis. Right to Life</u>, 551 U.S. at 474 n.7.

[139] 130 S. Ct. at 916.

that spends $1,500 for ads could be required to register as a PAC. But a mega-group that spends $1,500,000 to defeat the same candidate would not have to register because the defeat of that candidate could not be considered the corporation's major purpose. I see nothing in the Supreme Court's recent case law suggesting that the First Amendment's protections should apply so unequally.[140]

### 2. Independent Expenditure Regulation

Independent expenditures in connection with an election are, generally speaking, those made by speakers other than the candidate. Maine's statute that requires the reporting of these independent expenditures has a narrow definition that includes only express advocacy—"any communication that expressly advocates the election or defeat of a clearly identified candidate."[141] There is nothing unconstitutionally vague about that definition, and the Supreme Court has made clear that reporting for such expenditures can be

---

[140] I did reserve deciding the issue in ruling on the request for injunctive relief last year in the ballot question committee context, suggesting that the argument could be more persuasive in the arena of candidate elections. See Nat'l Org. for Marriage, 666 F. Supp. 2d at 210 n.93. However, I now find no support for making this a constitutional requirement in state elections. To the extent that N.M. Youth Organized v. Herrera, 2010 U.S. App. LEXIS 13381 (10th Cir. June 30, 2010), suggests the contrary, I respectfully disagree with it for this case in Maine where there is no prohibition of speech. Moreover, Maine's threshold, $5,000 spent on campaign activity, 21-A M.R.S.A. § 1052(5)(A)(5), is a significant proportion of the average cost of campaigns in Maine. See Second Wayne Aff. ¶ 33 (93% of the average cost of a House race, and 22% of the average cost of a Senate race). It effectively protects the kinds of speakers with whom I was concerned in Volle.

[141] 21-A M.R.S.A. § 1019-B(1)(A). Although the statute uses the term "expenditure," which includes the forms of transferring things of value in 21-A M.R.S.A. § 1012(3)(A), it clearly narrows the "purpose" phrase in the latter to include only express advocacy or in the case of Maine Clean Election law candidates, communications speaking about a candidate shortly before an election.

constitutionally required.[142]  NOM challenges the threshold of $100 as too low, but Buckley upheld a $100 threshold and said:

> We cannot require Congress to establish that it has chosen the highest reasonable threshold.  The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion.  We cannot say, on this bare record, that the limits designated are wholly without rationality.[143]

Although inflation has reduced the value of $100 since Buckley's statement in 1976, the judgment about the threshold is still best left to the legislature.[144]

NOM also attacks the presumption in a Maine Clean Election Act candidate election that any expenditure for a communication "that names or depicts a clearly identified candidate" and is disseminated during the twenty-one days before a primary or thirty-five days before a general election is presumed to be an independent expenditure even if it is not express advocacy. Federal law also regulated speech during an election window, but not by "presumption"; it is flatly subject to disclosure and the Supreme Court has upheld that degree of regulation.  Maine's law runs into trouble because it tries to be more sympathetic to speech and creates a statutory method for the speaker to destroy the presumption and then for the Commission to make a determination.  That method is constitutionally problematic.  It requires an organization like NOM to say that the expenditure "was not incurred with the

---

[142] See Buckley, 424 U.S. at 81.

[143] Id. at 83.  The $100 threshold for independent expenditure reporting under Maine law protects those making de minimis expenditures.  The required reporting is simple and limited to disclosures substantially related to the state's interest in providing voters with useful information.  As explained in text, the twenty-four hour reporting requirements make it possible for voters to get timely information when it is most likely to matter to the electoral process.

[144] See Daggett v. Webster, 74 F. Supp. 2d 53, 63 (D. Me. 1999) (upholding $50 threshold on reporting requirements).

intent to *influence* the nomination, election or defeat of a candidate."[145]  That influence test is unconstitutionally vague, as I have already determined. Moreover, if the presumption is destroyed, the Commission is entitled to gather evidence and ultimately can treat the expenditure as an independent expenditure if it finds by a preponderance of the evidence that it was "incurred with intent to *influence* the nomination, election or defeat of a candidate."[146] Again, that standard is unconstitutionally vague after <u>Buckley</u>.  It would have been cleaner if Maine had stated flatly that such expenditures within the window are subject to disclosure with no exceptions.

But <u>McConnell</u> and <u>Citizens United</u> have made the rebuttal exercise pointless.  <u>McConnell</u> dealt with the new term "electioneering communication" under federal law, defined as a communication clearly identifying a candidate within in a certain window of time before the election, but not expressly advocating support or opposition to the candidate.[147]  <u>McConnell</u> ruled that constitutional regulation of campaign speech was not limited to express advocacy and, when disclosure rather than prohibition was involved, could encompass electioneering communications.  The Supreme Court stated: "[T]he important state interests that prompted the <u>Buckley</u> Court to uphold FECA's disclosure requirements—providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions—apply in

---

[145] 21-A M.R.S.A. § 1019-B(2) (emphasis added).
[146] 21-A M.R.S.A. § 1019-B(2) (emphasis added).
[147] 540 U.S. at 189.

full[.]"[148] <u>Citizens United</u> went further than <u>McConnell</u>. It did not limit the government's informational interest to disclosures of "electioneering activity" under the Federal Election Commission Act.[149] Rather, it recognized the general "public . . . interest in knowing who is speaking about a candidate shortly before an election"—even if the speech is only a commercial for a film about a candidate.[150] In <u>Citizens United</u>, this "informational interest alone" was "sufficient" to justify a disclosure requirement.[151] Maine's statute treating statements about a clearly identified candidate in the limited period before an election is similarly justified, and there is no constitutional need to provide for a rebuttal to the presumption that it is an independent expenditure. I therefore sever the rebuttal provision.

Finally on independent expenditure regulation, NOM attacks the Commission's regulatory definition of what it means to "expressly advocate," in particular, the Commission's inclusion of "communications of campaign slogan(s) or individual word(s), which *in context* can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s)."[152] If that were all the regulation said, NOM might have a point, because the Supreme Court has said that "contextual factors . . . should seldom play a significant role in the inquiry" into whether communication is

---

[148] <u>Id</u>. at 196.

[149] <u>Id</u>.

[150] <u>Citizens United</u>, 130 S. Ct. at 915.

[151] <u>Id</u>. I therefore do not rely on the other governmental interests that the State asserts here, deterring corruption and its appearance by enabling effective administration of the Maine Clean Election Act and gathering data for enforcement of other substantive election laws. <u>See</u> Defs.' Opp'n at 15.

[152] 94-270-001 Me. Code R. § 10(2)(B) (emphasis added).

express advocacy.[153]  But the Maine regulation also offers illustrations:  "such as posters, bumper stickers, advertisements, etc. which say 'Pick Berry,' 'Harris in 2000,' 'Murphy/Stevens' or 'Canavan!'"[154]  Those examples make clear that the Commission is hewing closely to the Supreme Court's recognition that "[c]ourts need not ignore basic background information that may be necessary to put an ad in context—such as whether an ad 'describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of such scrutiny in the near future.'"[155]  Here, the "context" is knowing that Berry is a candidate to be picked on the ballot, that 2000 is an election where Harris should win, etc.  That use of context is not unconstitutional.

The burden Maine imposes is minimal.  If an independent expenditure over $100 is made, the organization must file a report identifying the candidate election involved, whether the expenditure was in support of or in opposition to that candidate, and the amount and purpose of the expenditure.[156]  The requirement that expenditures over $100 be reported within twenty-four hours if made within two weeks of an election (except election day) is more of a burden, but a justifiable burden: it is also very closely tied to the state's interest in providing information to voters at precisely the time that such information can be of greatest use to voters.  But the Attorney General has not provided any justification for the regulation's (not the statute's) requirement that expenditures in excess of $250 per candidate must be reported within

---

[153] Wis. Right to Life, Inc., 551 U.S. at 473-74.
[154] 94-270-001 Me. Code R. § 10(2)(B).
[155] Wis. Right to Life, Inc., 551 U.S. at 474.
[156] 21-A M.R.S.A. § 1019-B(3)(B).

twenty-four hours *whenever they are made.*[157]   I have no basis for finding that time-unlimited burdensome requirement substantially related to the government's informational interests in campaign disclosure.   Therefore, I conclude that it imposes an impermissible burden and cannot be enforced.

### 3.   *Attribution and Disclaimer Regulation*

Citizens United has effectively disposed of any attack on Maine's attribution and disclaimer requirements.[158]   That case holds that attribution and disclaimer requirements survive exacting scrutiny analysis.[159]   According to the Supreme Court, they "may burden the ability to speak, but they 'impose no ceiling on campaign-related activities.'"[160]   They are justified by the governmental interest in providing information to the electorate and permitting the electorate to make informed choices.[161]   Indeed, Citizens United refused to import the "express advocacy and its functional equivalent" test into disclosure and disclaimer rules.[162]   Whether they deal with express advocacy or not, "the public has an interest in knowing who is speaking about a candidate shortly before an election."[163]

---

[157] 94-270-001 Me. Code R. § 10(3)(B).

[158] 130 S. Ct. at 915.   McConnell earlier upheld attribution and disclaimer requirements, dealing with a requirement that certain communications not authorized by the candidate "identify the payor and announce the lack of authorization" and finding that the requirement "bears a sufficient relationship to the important governmental interest of 'shed[ding] the light of publicity' on campaign financing."   540 U.S. at 230-31 (discussing "disclosure" requirements) (citations omitted); see also 130 S. Ct. at 915 ("[W]e now adhere to [McConnell] as it pertains to the disclosure provisions.").

[159] 130 S. Ct. at 915-16.

[160] Id. at 914 (citation omitted).

[161] Id. at 916.

[162] Id. at 915.

[163] Id.

The requirement that these communications include disclosure of whether the candidate authorized the message and the identity of the person or group that made or financed the message is tied directly to the state's informational interest and provides voters with immediate insight into whose interests a candidate may serve.[164] The impositions are minimal, given the important interests involved.[165]

## CONCLUSION

For the foregoing reasons, I declare that Maine's use of the "influence" and "influence in any way" standards in its election laws is unconstitutionally vague and that its regulation requiring twenty-four-hour disclosure of any independent expenditure over $250 at any time is unconstitutionally burdensome. Otherwise, Maine's laws governing PACs, independent campaign expenditures, and attribution and disclaimer requirements are constitutional and survive NOM's challenges that they are unconstitutionally vague and overbroad[166] and that they impose excessive burdens that chill NOM's speech preceding this fall's elections and thereafter. My ruling is based upon pertinent Supreme Court precedents and the State's failure to offer any narrowing interpretation of vague language or justification for its regulatory language. In light of the ongoing development of Supreme Court caselaw in this area, there

---

[164] See id. ("At the very least, the disclaimers avoid confusion by making clear that the ads are not funded by a candidate or political party.").

[165] The statute exempts communications "not made for the purpose of influencing" an election. 21-A M.R.S.A. § 1014(2-A). I have already ruled that the term "influence" is unconstitutionally vague as a result of Buckley. I therefore sever the exemption from the statute.

[166] Aside from what I have noted in note 134, supra, I see no overbreadth issues as that term is used in Humanitarian Law Project. See 130 S. Ct. at 2719. The entire focus of NOM's argument is that the law impermissibly applies specifically to NOM's activities.

probably is an opportunity for carefully drafted legislation to cure some of the defects I have enumerated.

The Clerk shall enter declaratory judgment that the phrase "influence in any way" and the verb "influence" as they appear in the following provisions of Maine election law, 21-A M.R.S.A. §§ 1052(4-5), 1012(3), 1053-B, 1019-B(2), and 1014(2-A), are unconstitutionally vague, but that otherwise the plaintiff NOM's constitutional challenges fail.

The Clerk shall also enter declaratory judgment that the regulatory provision, 94-270-001 Me. Code R. § 10(3)(B), requiring twenty-four-hour disclosures of independent expenditures over $250, not just immediately before an election but whenever they occur, has not been justified and is impermissibly burdensome and cannot be enforced.

Consistent with this declaratory judgment, judgment shall enter in part for the plaintiff NOM and in part for the defendants on Counts V, VI, VII, and VIII of the plaintiff's Second Amended Verified Complaint. Pursuant to Rule 54(b), I find that there is no just reason for delay, and indeed that the public interest calls for availability of immediate appeal of this election law decision.

I conclude that the plaintiff has satisfied all four criteria for injunctive relief in this First Amendment election law case.[167] As in previous election law cases,[168] however, I do not at this time actually issue the injunction because I have no indication that the State will decline to comply with this court's

---

[167] See Asociacion de Educacion Privada de P.R., 490 F.3d at 21.
[168] See Volle, 69 F. Supp. 2d at 177 n.10.

declaratory judgment. The plaintiff is free to renew its request should that become necessary.

**SO ORDERED.**

**DATED THIS 19TH DAY OF AUGUST, 2010**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**