# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **NATIONAL ORGANIZATION FOR MARRIAGE AND AMERICAN PRINCIPLES IN ACTION,** | ) ) ) ) | |
| **PLAINTIFFS** | ) ) | |
| **v.** | ) ) | **CIVIL NO. 09-538-B-H** |
| **WALTER F. MCKEE,** *in his official capacity as member of the Commission on Governmental Ethics and Election Practices,* **ET AL.,** | ) ) ) ) ) | |
| **DEFENDANTS** | ) | |

## DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

### INTRODUCTION

This portion of a two-pronged lawsuit challenges the constitutionality of Maine's election law as it applies to registration and disclosure requirements for ballot question committees.[1]  On October 28, 2009, I denied the plaintiffs' motion for a temporary restraining order.[2]  That ruling required me to assess the likelihood of the plaintiffs succeeding on the merits of their First Amendment constitutional claims.  As a result, I analyzed the relevant legal

---

[1] The other prong dealt with candidate election law issues; it challenged the constitutionality of Maine's definition of "political action committee," its regulation of independent expenditures (expenditures made by speakers other than the candidate), and its attribution and disclaimer requirements for political messages.  I ruled on that challenge in a bench trial ruling, <u>Nat'l Org. for Marriage v. McKee</u>, 723 F. Supp. 2d 245 (D. Me. 2010), a ruling now on appeal to the First Circuit.

[2] <u>Nat'l Org. for Marriage v. McKee</u>, 666 F. Supp. 2d 193, 198 (D. Me. 2009).

issues in some detail.  I do not repeat that analysis.  Instead, I incorporate that earlier analysis into this opinion, but modify it as appropriate in light of new cases or re-thinking provoked by the parties' new briefing and their oral argument on January 24, 2011.  Now I conclude finally that this Maine law is constitutional, and I award summary judgment to the defendants.

BACKGROUND

**A.    _Maine's Ballot Question Committee Law_**[3]

Maine law defines a "ballot question committee" as "[a] person not defined as a political action committee who receives contributions or makes expenditures, other than by contribution to a political action committee, aggregating in excess of $5,000 for the purpose of initiating, promoting, defeating or influencing in any way a campaign. . . ."[4]  For these purposes, the term "'campaign' does not include activities to promote or defeat or in any way influence the nomination or election of a candidate,"[5] but it does encompass a ballot "question," including the people's veto referendum process provided for in the Constitution of Maine.[6]

---

[3] The Maine legislature amended the statute effective July 12, 2010.  P.L. 2009, ch. 524 §§ 8-13 ("An Act To Improve Disclosure of Campaign Finance Information and the Operation of the Maine Clean Election Act") (codified at 21-A M.R.S.A. § 1056-B (Supp. 2010)).  The amendment replaces the term "ballot question" with "campaign," but excludes candidate elections and retains the term "ballot question committee."  Id.  Although all parties quote the old version of the statute in their summary judgment papers, the amendment does not affect the outcome of this case and I use the new language.

[4] 21-A M.R.S.A.  § 1056-B.    A "person" is defined as "an individual, committee, firm, partnership, corporation, association or organization."  21-A M.R.S.A. § 1001.

[5] § 1056-B.

[6] 21-A M.R.S.A. § 1052(1)(A).  See Me. Const. art IV, pt. 3, § 17 ("Proceedings for people's veto").  For these purposes, a "campaign" also includes Maine's citizen initiative referendum procedure, an amendment to the Constitution of Maine, legislation expressly conditioned upon ratification by a referendum vote, the ratification of the issue of bonds by the State, and any county or municipal referendum.  § 1052(1)(B)-(F).

The statute defines "contribution" as including, but not limited to:

> A.      Funds that the contributor specified were given in connection with a campaign;
> B.      Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating, promoting, defeating or influencing in any way a campaign;
> C.      Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating, promoting, defeating or influencing in any way a campaign when viewed in the context of the contribution and the recipient's activities regarding a campaign; and
> D.      Funds or transfers from the general treasury of an organization filing a ballot question report.[7]

A group's designation as a "ballot question committee" triggers various reporting requirements.  It must name a treasurer[8] and register with the Maine Commission on Governmental Ethics and Election Practices ("Commission") by filing a two-page registration form.[9]   The registration form requires the committee's name and address; the name and address of the treasurer of the committee, any principal officers, and any primary fundraisers and decision makers for the committee; the legal structure of the committee (*e.g.*, cooperative, corporation, voluntary association, partnership); and a statement "indicat[ing] whether the committee supports or opposes a candidate, political committee, referendum, initiated petition or campaign."[10]   The registration form

---

[7] § 1056-B(2-A).

[8] § 1056-B.  At the time the plaintiffs filed their initial complaint, both had treasurers.  Defs.' Statement of Additional Material Facts ("DSMF") ¶¶ 40, 85 (Docket Item 177); Pls.' Opposing Statement of Material Facts ("Pls.' Opposing SMF") ¶¶ 40, 85 (Docket Item 199).

[9] § 1056-B; Registration: Ballot Question Committees: For Persons and Organizations Other Than PACs Involved in Ballot Question Elections (Ex. 7 to Second Am. Verified Compl. (Docket Item 114-4)).

[10] Id.

also instructs committees to file an initial campaign finance report at the time of the registration.[11]

Thereafter, ballot question committees must submit to the Commission quarterly reports according to the statute's regular schedule for reporting (January 15th, April 10th, July 15th, and October 10th), and election reports on certain dates relative to the election at issue (the eleventh day before an election and the forty-second day after the election).[12]  Each report must include an itemized account of "each expenditure made to and contribution received from a single source aggregating in excess of $100 in any election;" the date of each contribution and expenditure; the name and address of each contributor, payee or creditor; the occupation and principal place of business of any contributor donating more than $100; and the purpose of each expenditure.[13]  Ballot question committees need report only those contributions and expenditures made to promote, defeat, or influence the ballot question.[14]  In the two weeks before the election, ballot question committees must report all expenditures of $500 or more within 24 hours of that expenditure.[15]  In addition, they must "keep a detailed account of all contributions made to the filer for the purpose of initiating, promoting, defeating or influencing in any way a campaign and all expenditures made for those purposes" and "retain a vendor invoice or receipt stating the particular

---

[11] Id.
[12] § 1056-B; 21-A M.R.S.A. § 1059.  A committee that files an election report "is not required to file a quarterly report when the deadline for that quarterly report falls within ten days of the filing deadline" of the election report.  § 1059(D).
[13] § 1056-B(2).
[14] Id.
[15] § 1059(2)(E).

goods or services purchased for every expenditure in excess of $50."[16]   These records must be kept for four years.[17]   Finally, ballot question committees must file termination reports when they cease financial activity.[18]

The Commission is charged with administering Maine's campaign finance laws, including those governing ballot question committees.[19]   The Commission provides a written explanation of the filing requirements on its website, and its staff is available to provide advice to ballot question committees.[20]   Voters and the press can view the information contained in ballot question committees' registration and campaign finance reports on the Commission's website by clicking on the name of a ballot question committee.[21]

The Commission also has an enforcement role.[22]   Failure to register as a ballot question committee is punishable by a $250 fine.[23]   The Commission may also assess a civil penalty for failure to file a required report.[24]   The maximum penalty for failure to file a report required under section 1056-B or section 1059 is $10,000.[25]   A person who fails to file a report as required within

---

[16] § 1056-B(4).
[17] Id.
[18] § 1056-B(1); 21-A M.R.S.A. § 1061.
[19] DSMF ¶ 91; Pls.' Opposing SMF ¶ 91.
[20] DSMF ¶¶ 95-99; Pls.' Opposing SMF ¶¶ 95-99.   In June 2008, the Commission adopted guidance that it posted on its website for ballot question committees concerning reporting requirements.   DSMF ¶ 101; Pls.' Opposing SMF ¶ 101.   See ME. COMM'N ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, GUIDANCE ON REPORTING AS A BALLOT QUESTION COMMITTEE, http://www.maine.gov/ethics/bqcs/guidance.htm (adopted on July 27, 2008) [hereinafter GUIDANCE ON REPORTING].
[21] DSMF ¶¶ 129-130; Pls.' Opposing SMF ¶¶ 129-130.
[22] DSMF ¶ 105; Pls.' Opposing SMF ¶ 105.
[23] 21-A M.R.S.A. § 1062-A(1).
[24] § 1062-A(8-A).
[25] Id.

30 days of the filing deadline is guilty of a Class E Crime.[26]  The State may not, however, prosecute a violation of the filing requirements if the Commission has assessed and collected a civil penalty.[27]

**B.      NOM, APIA, and Ballot Question 1**

In November 2009, Maine voters were asked to vote on a ballot question, Question 1, to overturn recent legislation authorizing same-sex marriage in Maine.[28]   The plaintiffs National Organization for Marriage ("NOM") and American Principles in Action ("APIA") supported the ballot question.   The defendants are the Maine officials who implement and enforce Maine's election laws.  The case is presented on cross-motions for summary judgment.  For the most part, there are no material factual disputes.  In any situation where there appears to be a dispute, I have credited the plaintiffs' version of the facts.

NOM is a non-profit corporation organized under Virginia law.[29]   Its corporate purpose as stated in its articles of incorporation is "to promote the importance of preserving marriage as the union of one husband and one wife" and "to advocate for policies that will preserve the historic definition of marriage and the natural family that springs therefrom."[30]   Consistent with its purpose, NOM raises funds to fight gay marriage throughout the country.[31]

---

[26] § 1062-A(8).
[27] Id.
[28] Question 1: People's Veto (2009).
[29] Pls.' Statement of Material Facts ("PSMF") ¶ 3 (Docket Item 139); Defs. Opposing Statement of Material Facts ("Defs.' Opposing SMF") ¶ 3 (Docket Item 177).
[30] PSMF ¶ 5; Defs.' Opposing SMF ¶ 5.
[31] DSMF ¶¶ 57-68; Pls.' Opposing SMF ¶¶ 57-68.  For a description of NOM's activities outside of Maine, see Nat'l Org. for Marriage v. McKee, 723 F. Supp. 2d 245, 250-51 (D. Me. 2010).

In 2009, NOM contributed approximately $1.9 million (out of total 2009 expenditures of roughly $8 million), to Stand for Marriage Maine ("SMM"), a registered Political Action Committee promoting a "Yes" answer on Question 1.[32]  According to a newsletter that NOM sent its members, NOM was "the largest contributor to the Yes on 1 effort in Maine."[33]  NOM's Executive Director, Brian S. Brown, also served on the Executive Committee of SMM and helped raise funds for both NOM and SMM.[34]

Between May 6, 2009 and November 3, 2009, NOM distributed e-mails to its subscribers providing news updates regarding same-sex marriage in Maine and other states.[35]  These e-mails included solicitations for funds "to start the referendum process immediately when the law [authorizing same sex marriage] is signed, ensuring that the measure does not take effect before the people of Maine have had their say," to "defend marriage in Maine and across the country," to "fight to protect marriage in Iowa, Maine, and everywhere across this great land," and to "recover the true meaning [of] marriage" in "Maine and our country."[36]  Each of the e-mails contained a hyperlinked "Donate" button which sent potential donors to the donations screen at a website.[37]  The donations screen at the website stated that "[n]o funds will be earmarked or

---

[32] DSMF ¶ 8; Pls.' Opposing SMF ¶ 8.
[33] DSMF ¶ 16; Pls.' Opposing SMF ¶ 16; NOM Newsletter dated November 6, 2009 (Ex. 2 to Defs.' Third Mot. for Prelim. Inj. (Docket Item 127-2)).
[34] DSMF ¶¶ 11, 13; Pls.' Opposing SMF ¶¶ 11, 13.
[35] PSMF ¶ 9; Defs.' Opposing SMF ¶ 9.
[36] DSMF ¶¶ 57, 59, 63, 67; Pls.' Opposing SMF ¶¶ 57, 59, 63, 67.
[37] PSMF ¶ 10; Defs.' Opposing SMF ¶ 10.

reserved for any political purpose."[38]   NOM received approximately $4,284 in donations as a result of these e-mail solicitations.[39]

NOM contributed approximately $1.2 million to SMM in October 2009.[40] In addition to the e-mail solicitations, NOM raised funds by telephone and in-person.[41]   It also received recurring donations from major donors.[42]   NOM mentioned the campaign in Maine in conversations with major donors.[43]   NOM does not, however, solicit or accept designated contributions.[44]

On August 13 and 24, 2009, Fred Karger of Californians Against Hate sent e-mail correspondence to the Commission requesting that the Commission investigate whether NOM had violated Maine's campaign finance laws by contributing to SMM.[45]   On August 27, 2009, the Commission invited both SMM and NOM to respond and they did so.[46]   The Commission considered the evidence and legal argument submitted by NOM and SMM, and, before the November 3, 2009 election, authorized its staff to conduct an investigation into whether NOM had violated Maine law by failing to register and file campaign finance reports as a ballot question committee.[47]   At oral argument, the Assistant Attorney General told me that the investigation is ongoing.

---

[38] Id.
[39] DSMF ¶¶ 57-68; Pls.' Opposing SMF ¶¶ 57-68.
[40] Pls.' Opposing SMF ¶ 24; NOM Dep. at 211 (Docket Item 128).
[41] NOM Dep. at 276-280.
[42] Id.
[43] Id.
[44] Id.
[45] PSMF ¶ 12; Defs.' Opposing SMF ¶ 12.
[46] DSMF ¶¶ 163, 164; Pls.' Opposing SMF ¶¶ 163, 164.
[47] DSMF ¶ 166 (citing Wayne Aff. ¶ 54 (Docket Item 19)); Pls.' Opposing SMF ¶ 166.

APIA is a non-profit corporation organized under District of Columbia law.[48]   It is dedicated to promoting equality of opportunity and ordered liberty.[49]   APIA does not have as its major purpose the initiation, promotion, defeat, or influencing of a Maine ballot question.[50]   APIA intended to buy television time to broadcast advertisements prior to the November 3, 2009 election.[51]   It developed two proposed scripts for thirty-second videos.[52]   The first featured a conversation between a mother and her daughter, in which the girl would say, "Mommy, are you a bigot? . . . At school, we learned that people who are against gay marriage are bigots."  Her mother would reply, "No, dear.  I believe that homosexuals should be treated fairly—but I also believe that marriage should be just for one man and one woman.  That doesn't make me a bigot."[53]   In another proposed video advertisement featuring a boy in kindergarten, a school administrator would say he is "very proud of the new curriculum" that "teach[es] kids to embrace different lifestyles and explore their own sexuality."[54]   Both of the proposed advertisements would end with a "Vote Yes Graphic."[55]

As it turned out, APIA never filmed or aired the video advertisements, nor did it raise funds for the purpose of doing so, because it says it was "chilled from doing so . . . by the prospect of having to register as a [ballot question

---

[48] DSMF ¶ 84; Pls.' Opposing SMF ¶ 84.
[49] PSMF ¶ 16; Defs.' Opposing SMF ¶ 16.
[50] PSMF ¶ 17; Defs.' Opposing SMF ¶ 17.
[51] PSMF ¶ 18; Defs.' Opposing SMF ¶ 18; Second Am. Verified Compl. ¶ 50 (Docket Item 114).
[52] Id.  APIA intended to broadcast the videos on its website and on television.  Second Am. Verified Compl. ¶¶ 47, 50.
[53] PSMF ¶ 19; Defs.' Opposing SMF ¶ 19.
[54] PSMF ¶ 20; Defs.' Opposing SMF ¶ 20.
[55] PSMF ¶¶ 19-20; Defs.' Opposing SMF ¶¶ 19-20.

committee] and meet the reporting and other requirements of sections 1056-B and 1059."[56]   But it intends to solicit funds to fight gay marriage "in future elections."[57]

Both plaintiffs contend that Maine's ballot question law violates their free speech and associational rights.[58]

**ANALYSIS**

**MOOTNESS AS TO AMERICAN PRINCIPLES IN ACTION ("APIA")**

Now that the 2009 ballot is past and APIA ran no advertisements and raised no money to do so, the defendants argue that APIA's claims are moot. Although in its Second Amended Verified Complaint, APIA alleged that it intended to solicit funds for the cost of advertisements regarding the same-sex marriage question both on the November 2009 ballot "and in future elections,"[59] the defendants maintain that "there is no record evidence that a similar controversy will recur" in the future.[60]

In <u>New Hampshire Right to Life Political Action Committee v. Gardner</u>,[61] the First Circuit stated:

> [C]ases challenging statutes that touch upon the electoral process are *sui generis*. There often is insufficient time to resolve even a promptly filed case before the election is actually held. Mindful of that pitfall, the Supreme Court has tended to treat such challenges as coming within the exception to the mootness doctrine for cases that, though capable of repetition, may evade review.

---

[56] Second Am. Verified Compl. ¶¶ 50-51; DSMF ¶¶ 89-90; Pls.' Opposing SMF ¶¶ 89-90.

[57] Second Am. Verified Compl. ¶ 51.

[58] <u>Id</u>. ¶ 52.

[59] <u>Id</u>. ¶ 51.

[60] Defs.' Opp'n to Pls.' Mot. for Summ. J. and Cross-Motion for Summ. J. at 11 (Docket Item 176).

[61] 99 F.3d 8, 18 (1st Cir. 1996).

I conclude that the <u>New Hampshire Right to Life</u> principle applies here.  APIA has asserted an abiding interest in the same-sex marriage issue, that issue is likely to recur (the 2009 ballot voted same sex marriage down) and, as this case demonstrates, it is difficult to reach the merits of such an issue before the election has come and gone.  I conclude that the controversy is not moot as to APIA.[62]

### CONSTITUTIONAL CHALLENGES TO MAINE'S REGISTRATION AND REPORTING REQUIREMENTS FOR BALLOT QUESTION COMMITTEES

### A.    *Standard of Review*

Because the Maine ballot question committee registration statute imposes no limits on contributions or expenditures, but only registration and reporting requirements, I ruled in my decision on the plaintiffs' motion for a temporary restraining order that the "exacting scrutiny" standard applied to their constitutional challenges.[63]  At the time of that ruling, the caselaw was not uniform, but thereafter in <u>Citizens United v. Federal Election Commission</u>, the Supreme Court confirmed that exacting scrutiny is the appropriate standard for reviewing a constitutional challenge to reporting requirements:

> Disclaimer and disclosure requirements may burden the ability to speak, but they "impose no ceiling on campaign-related activities and "do not prevent anyone from speaking." The Court has subjected these requirements to "exacting scrutiny," which requires a "substantial relation" between the disclosure requirement and a "sufficiently important" governmental interest.[64]

---

[62] The defendants do not raise mootness as to NOM, and I would therefore address the constitutional issues regardless.

[63] <u>Nat'l Org. for Marriage v. McKee</u>, 666 F. Supp. 2d 193, 203-04 (D. Me. 2009).

[64] <u>Citizens United v. FEC</u>, 130 S. Ct. 876, 914 (2010) (citations omitted); <u>accord</u> <u>Doe v. Reed</u>, 130 S. Ct. 2811, 2814 (2010).

### B.    Treatment as Political Action Committees

The plaintiffs argue that Maine treats ballot question committees essentially like political action committees (PACs), and that such treatment is unconstitutional.   I adopt here the reasoning that I used in rejecting that challenge in denying the TRO:

> Although the plaintiffs recognize that First Amendment cases consistently hold that states can require disclosure of the source of money spent on ballot questions, they say that Maine has gone too far.  The plaintiffs argue that Maine treats them too much like PACs (registration, required treasurer, records maintenance, recurrent reporting),  and say that a number of cases have said that states cannot treat issue-only organizations and individuals like PACs.  They contend that Maine is entitled to demand only "one-time" disclosure of the contributions and expenditures.
>
> It is true that a number of cases have criticized the PAC-style regulatory model that Maine seems to be approaching, when that regime is applied to those who do not support candidates, but simply take positions on issues, as here. Issue advocacy is the classic heart of First Amendment protection and should be burdened as little as possible.   Regulation tends to grow and to develop requirements appropriate for large organizations (like these plaintiffs) and to ignore the burdensome effects on the speech of individuals and small organizations.  I reached that very conclusion in Volle, a case involving an individual asserting his First Amendment rights.  Volle provoked the initial version of this legislation in 2000.  In response to Volle, Maine adopted financial reporting-requirement legislation and did not impose the other layers of regulation.  They emerged in only the 2007 amendments.
>
> Nevertheless, I conclude that the plaintiffs cannot show a likelihood of success on their claim.
>
> The registration requirements here are much less burdensome and more narrowly tailored than those I confronted in Volle.   The person or organization who exceeds the $5,000 threshold must register, identify a treasurer (these corporations already have one; an individual can identify himself), and identify other important actors (if any). All that can be done on a simple 2-page form, with help from the Commission staff. Bureaucratic perhaps, but burdensome not.  This is unlike the regime I struck down in Volle where, once the monetary threshold was passed, the individual automatically became

a political action committee with the attendant requirements to disclose the names, addresses and account numbers of the depositories in which committee funds were kept. Moreover, the State has identified its compelling reason for imposing the registration requirement—namely, to provide important information to Maine voters about the interest groups that are attempting to influence the outcome of a ballot question in a climate where the number of ballot questions Maine voters face is steadily increasing.

Recent cases support my conclusion that this is not constitutionally burdensome. In <u>Alaska Right to Life Committee v. Miles</u>, the Ninth Circuit considered provisions of Alaska's campaign laws requiring entities to register before spending money to support or oppose a candidate. Alaska's registration form was 2 pages and asked for basic information, including the entity's name and purpose, the names and contact information of its officers, its campaign plans, and banking information if the entity anticipated raising more than $5,000. The court concluded that such requirements were "not significantly burdensome in themselves." Similarly, in <u>Human Life of Wash., Inc. v. Brumsickle</u>, registration requirements survived strict scrutiny because they were, in themselves, "not particularly onerous," and incorporated $5,000 contribution and expenditure threshold requirements that avoided "unduly burdening the smaller or less active organizations that might be more likely to self-censor their speech rather than comply with the state's requirements."

I also conclude that the plaintiffs cannot show a likelihood of success on their challenge to Maine's recurrent reporting requirement. Maine's compelling interest in ensuring that the electorate knows who is financially supporting the views expressed on a particular ballot question cannot be satisfied by one-time reporting. Instead, Maine is entitled to conclude that its electorate needs to know, *on an ongoing basis*, the source of financial support for those who are taking positions on a ballot initiative. It will not do to say that a one-time disclosure in the week before the election is sufficient. That would not give the opposing viewpoint the opportunity to point out the source of the financing and seek to persuade the electorate that the source of support discounts the message. Here, the Maine statute requires reports on the following schedule: (1) an initial report upon registration as a Ballot Question Committee; (2) quarterly reports on January 15th, April [10]th, July 15th, and October [10]th; (3) certain disclosures about expenditures made close to the election; and (4) a final report. That is an appropriate, not burdensome, schedule. Its predictability makes it easy for the news media to follow and to cover the story for the

public, and for opponents to inquire and spread the word as they see patterns develop. The extra reporting requirement for the period immediately preceding the election ensures that people will not avoid disclosure by scheduling their contributions and expenditures late.

Recordkeeping is essential to enforcement. The pace of activities leading up to an election means that careful investigation must often be delayed (as here). The Commission may have a variety of people and organizations to investigate, which takes time. The four-year requirement certainly seems to be at the outer limit, however. It is hard to envision, given election frequency, that a Commission concerned with elections would still be seriously investigating four years after an election. But the plaintiffs have not made any credible argument that if records must be kept for two years, there is a measurable incremental burden in keeping them for four years.[65]

Although I performed that analysis in terms of likelihood of success (I found none) on the merits, I reach the same conclusion here on the merits themselves, and I find no overbreadth; the requirements are constitutional, no matter how small the organization. Moreover, the <u>Human Life of Washington</u> case that I cited has now been affirmed by the Court of Appeals for the Ninth Circuit.[66] I am aware that the Court of Appeals for the Tenth Circuit struck down reporting requirements in connection with a non-candidate election in <u>Sampson v. Buescher</u>.[67] But that case involved a far more intrusive statute with complex requirements and many pages of rules and appendices.[68] Once a $200 threshold was reached, it applied to every $20 contribution made to

---

[65] <u>Nat'l Org. for Marriage</u>, 666 F. Supp. 2d at 206-08 (citations omitted; minor date corrections made in brackets).

[66] <u>Human Life of Wash., Inc. v. Brumsickle</u>, 624 F.3d 990, 1005-06 (9th Cir. 2010) ("by revealing information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention. This vital provision of information repeatedly has been recognized as a sufficiently important, if not compelling, governmental interest.")

[67] 625 F.3d 1247, 1249 (10th Cir. 2010).

[68] <u>Id.</u> at 1250. There, the Secretary of State's office actually recommended the hiring of an attorney to deal with the complexity. <u>Id.</u> at 1260.

groups of two or more people—in the case before the court, homeowners battling over an annexation proposal.[69]  The court found "virtually no proper governmental interest in imposing disclosure requirements on ballot-initiative committees that raise and expend so little money."[70]  This is not a <u>Sampson</u> case: here, $5000 is the threshold, and $100 is the reporting amount.[71]

The plaintiffs point to language in <u>Citizens United</u> that "PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations."[72]  But it is important to remember that <u>Citizens United</u> was dealing with whether corporations have First Amendment rights in an election context (<u>Citizens United</u> concluded that they do) and to read the Court's immediately preceding language, namely:

> Section 441b is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak. A PAC is a separate association from the corporation.  So the PAC exemption from § 441b's expenditure ban, § 441b(b)(2), does not allow corporations to speak.  Even if a PAC could somehow allow a corporation to speak—and it does not—the option to form PACs does not alleviate the First Amendment problems with § 441b.[73]

In other words, the Supreme Court was explaining that prohibiting a corporation from speech while allowing it to establish a PAC as an alternative did not alter the fact that the statute prohibited corporations from speaking directly.  That is not at all the situation here.  I conclude that the plaintiffs' constitutional challenge on this aspect fails.

---

[69] <u>Id</u>. at 1249.
[70] <u>Id</u>.
[71] 21-A M.R.S.A. § 1056-B.
[72] 130 S. Ct. 876, 897 (2010).
[73] <u>Id</u>. (citations omitted).

### C.     *The Major Purpose Requirement*

With respect to the plaintiffs' argument that Maine's statute is unconstitutional because it is not limited to so-called "major purpose PACs," I repeat what I said in denying their request for a TRO:

> The plaintiffs assert that Section 1056-B is unconstitutional because it imposes PAC-style requirements on them even though neither organization has as its major purpose the initiation, promotion, or defeat of a ballot measure. They claim that "to protect [the right of freedom of association] and to assure that registration requirements do not chill core political speech, Buckley v. Valeo established the 'major purpose' test, which is used to determine whether a particular group must register as a political committee under federal election law." They say that "[t]he purpose of the test is to reduce the burden on First Amendment speech by groups that are only incidentally involved in advocating the election or defeat of a candidate." They argue that the major purpose test should apply to void the application of Maine's PAC-like registration requirements to them, because passage or defeat of the ballot measure is *not* their major purpose.
>
> Buckley did hold that only entities "under the control of a candidate or the major purpose of which is the nomination or election of a candidate" could be regulated as political committees under the Federal Election Campaign Act of 1971. The Supreme Court thereby sought to reduce FECA's burden on First Amendment political speech by groups that are only incidentally involved in advocating the election or defeat of a candidate. The Court distinguished general political debate from expression directed at the election of candidates. But although the Buckley Court found that the major purpose test alleviated its overbreadth concerns in that context of federal regulation of candidate elections, the Supreme Court has never suggested that the major purpose test applies everywhere—as, for example, in this case involving state regulation of ballot questions only. Federal ballots, unlike state ballots, *only* have candidate elections, and that is all that the FECA could legitimately regulate. It made sense, therefore, for Buckley to distinguish general issue advocacy and to protect it, under the First Amendment, from regulation directed at candidate elections and, in doing so, to limit the federal regulation of political committees to committees that were candidate-controlled or whose major purpose was the nomination or election of a candidate. The plaintiffs urge me to import the major purpose test into this quite different area of state

> regulation of ballot questions where there are *no* candidates and where the entire focus is on disclosing who is behind the funding of a particular issue on which the electorate will be voting. They give me no reason for doing so. Instead, I observe that the Supreme Court has permitted certain kinds of state regulation in such cases . . ., without referring to the major purpose test. Accordingly, I assess the state interest and the burdens on speech as to each of the challenged requirements, applying the level of scrutiny identified in Davis, without imposing a separate "major purpose" test. I do not find that the Maine statute's PAC-style reporting requirements are overbroad simply because they are imposed on organizations whose major purpose is not the promotion or defeat of a ballot initiative in Maine.[74]

In my bench trial decision on NOM's challenge to the definition of when an organization becomes a "political action committee," I added that no Supreme Court case has applied the "major-purpose test" to state regulations, that "the Supreme Court has clarified that [this] part of Buckley . . . involved an 'intermediate step of statutory construction on the way to its constitutional holding,' not 'a constitutional test,'" and that applying it to state regulations would yield "perverse results."[75] Those comments apply here as well.[76]

---

[74] Nat'l Org. for Marriage v. McKee, 666 F. Supp. 2d 193, 208-210 (D. Me. 2009) (citations omitted). In Human Life of Washington, Inc. v. Brumsickle, 624 F.3d 990, 1009 (9th Cir. 2010), the Ninth Circuit ruled that there is no requirement that regulation be limited to organizations where political advocacy is "the" major purpose. In that case, the Ninth Circuit upheld a state law that required only that it be "a" major purpose, specifically stating that it was not deciding whether even that limitation ("a" major purpose) was constitutionally required. Id. at 1009-1010.

[75] Nat'l Org. for Marriage v. McKee, 723 F. Supp. 2d 245, 264 (D. Me. 2010) (quoting FEC v. Wis. Right to Life, Inc. 551 U.S. 449, 474 n.7 (2007)).

[76] In their reply brief, the plaintiffs intimate that there is unconstitutional overbreadth because "[o]rganization-based reporting and registration . . . affects the entire organization and its activities in all fifty states . . . ." Resp./Reply in Support of Pls.' Mot. for Summ. J. and in Opp'n to Defs.' Cross-Mot. for Summ. J. [hereinafter Pls.' Reply] at 7 (Docket Item 198). I see no unconstitutional overbreadth, however. This is only a reporting requirement, and it is legitimate for the Commission to require organization-wide reporting so that it can assess the legitimacy of how the organization reports its information.

**D.      Vagueness and Overbreadth**

At oral argument on January 24, 2011, the plaintiffs narrowed their vagueness and overbreadth challenge to subsections B and C of section 1056. Those subsections identify certain contributions that count for reporting requirements as follows:

> B.      Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating, promoting, defeating or influencing in any way a campaign;
>
> C.      Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating, promoting, defeating or influencing in any way a campaign when viewed in the context of the contribution and the recipient's activities regarding a campaign.[77]

A statute is unconstitutionally vague if it "'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"[78]  I repeat what I said in my Order on the TRO explaining why there is no vagueness in subsection B:

---

[77] 21-A M.R.S.A. § 1056-B(2-A).  In my Order on the TRO, I declined to address the phrase "not limited to" in § 1056-B(2-A) because neither party addressed the phrase and the Commission had not tried to enlarge the definitions in its regulatory materials.  Nat'l Org. for Marriage, 666 F. Supp. 2d at 210 n.99.  That remains the case at this stage of the proceedings.

[78] Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2718 (2010) (quoting United States v. Williams, 553 U.S. 285, 304 (2008)).  In my bench trial decision, I read Holder as identifying how to treat a vagueness challenge, even in the case of protected speech.  Nat'l Org. for Marriage, 723 F. Supp. 2d at 259 ("if the speech [of the plaintiff] is 'clearly proscribed,' then there is no successful *vagueness* claim") (citation omitted).  The plaintiffs disagree with that reading of Holder, arguing that in Holder the plaintiffs had made only a Fifth Amendment due process challenge to vagueness, not a First Amendment vagueness challenge, and that Holder is not a precedent for a First Amendment vagueness challenge.  Pls.' Reply at 11-12.   The Second and Eleventh Circuits seem to read Holder the way I read it.  United States v. Farhane, Nos. 07-1968, 07-5531, 2011 U.S. App. LEXIS 2201, at *23 n.9 (2d Cir. Feb. 4, 2011) (Holder "expressed a preference for as-applied review even where First Amendment rights are implicated."); United States v. Di Pietro, 615 F.3d 1369, 1372 (11th Cir. 2010) (Holder clarified that vagueness claims must be evaluated as-applied, even for challenges that implicate the First Amendment).  In any event, whether the analysis is under the First Amendment and allows a facial challenge, or under Fourteenth Amendment due process, the outcome is the same.

The plaintiffs argue that they cannot know what was in their contributors' minds. But the definition here is an objective standard tied to what the *plaintiffs* said in obtaining the funds, and they are in control of what they say. If their solicitation "would lead the contributor to believe that the funds would be used specifically for the purpose of initiating, promoting, defeating or influencing in any way a ballot question," then it is proper to conclude that the resulting gift was for such a purpose. That is the ordinary way in which language and communication work. Any other answer would allow the solicitor to propose all the relevant limitations and conditions in the solicitation, then argue unfairly that the resulting gift that did not expressly repeat those limitations and conditions could not be characterized as to purpose.[79]

My analysis of vagueness for subsection C still applies as well:

Identifying the meaning of subsection C is somewhat more difficult, and even the defendants' lawyer had trouble at the hearing specifying what contributions subsection C would cover that are not already within subsections A and B. Subsection A covers contributions that are "earmarked" specifically for a ballot purpose. Subsection B covers contributions that are not themselves "earmarked," but are in response to solicitations that make clear that the funds will be used for a ballot purpose, and thus are "earmarked" because the solicitor established that premise for the contribution. Subsection C seeks to cover still other contributions. Presumably the statute's drafters were concerned that those who solicit contributions might find devious ways to avoid coverage by keeping the language of both the solicitation and the donation clean of any suggestion of earmarking, even though everyone knew what was going on. The language that they chose to capture this category is clumsy. But as the plaintiffs agreed at the hearing, the vagueness question is evaluated only from the perspective of the person or organization required to report, and it is perfectly clear to tell them, as this subsection does, that if they reasonably should know from the entire context of what they are doing that a particular contribution is designed to influence a particular ballot, then they should treat it as such.[80]

---

[79] Nat'l Org. for Marriage v. McKee, 666 F. Supp. 2d at 211.
[80] Id. at 212.

The plaintiffs do make a new vagueness argument.  They assert that the exclusion of any "contribution to a political action committee"[81] is vague because it is not clear whether the exclusion "is limited to expenditures, or whether it applies also to any solicitation and contribution used to fund such an expenditure."[82]  I disagree.  There is nothing unclear in the phrase "contribution to a political action committee."  It means what it says, and nothing in the wording suggests that the exclusion applies to solicitations and receipts to *fund* the contribution.  The Commission's published Guidance confirms that interpretation.[83]

As for overbreadth, according to a recent First Circuit decision:

> "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'"  Thus, "[i]n a facial challenge to the overbreadth . . . of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.  If it does not, then the overbreadth challenge must fail."  The Supreme Court has warned that "[t]he overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'"[84]

There is nothing in B or C that falls under the overbreadth doctrine.

---

[81] The statute defines a ballot question committee in part as "[a] person not defined as a political action committee who receives contributions or makes expenditures, other than by contribution to a political action committee, aggregating in excess of $5,000 . . . ." § 1056-B.

[82] Pls.' Mot. for Summ. J. at 12-13 (Docket Item 138).

[83] See GUIDANCE ON REPORTING, *supra* note 20 ("If an organization solicits and receives contributions for the purpose of influencing a ballot question and gives those funds to a PAC, the contributions received by the organization count towards the $5,000 threshold.").

[84] URI Student Senate v. Town of Narragansett, No. 10-1209, 2011 U.S. App. LEXIS 141, at *22-23 (1st Cir. Jan. 5, 2011) (citations omitted).

### E.     The $100 Reporting Threshold

Nothing has changed since I concluded that the plaintiffs could not show even a likelihood of success on the merits of their challenge to the requirement that all contributions over $100 be reported.   I therefore repeat what I said then:

> Once a person or entity reaches the $5,000 (more than) threshold, it must report each expenditure to, and each contribution, from a single source if, in aggregate, they exceed $100.  The plaintiffs say that the $100 limit is not narrowly tailored to Maine's interest in providing voters with information about who supports a proposition.  They contend that information about small, individual donors has "little, if any" value to voters and that, therefore, disclosure of small donors' names, addresses, occupations, and employers is a burden wholly out of proportion to the state's interest.
>
> I disagree.   Buckley held that disclosure of contributions to candidates can help "voters to define more of the candidates' constituencies."   Buckley's logic holds here.  As the Ninth Circuit explained in Getman, "[k]nowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown.  At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation."   The public has an interest in knowing, for example, that a ballot measure has been supported by a multitude of gifts, even small gifts, from a particular state or from a specific profession.   Such information could be crucial in the context of ballot measures involving public works projects or regulatory reform.  The issue is thus not whether voters clamor for information about each "Hank Jones" who gave $100 to support an initiative.   Rather, the issue is whether the "cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill."   Like the Protectmarriage.com court, I conclude that the state's interest to provide this information to voters is "not only compelling but critical" to the proper functioning of the system of direct democracy.  The $100 threshold in § 1056-B is narrowly tailored to the state's interest.  It protects from public disclosure those small donors who offer a campaign de minimis support, and focuses voters on those

backers of a measure most likely to represent the referendum's constituency. Under Buckley, I cannot require the Maine legislature to show that it has chosen the "highest reasonable threshold." The precise threshold required to trigger disclosure "is necessarily a judgmental decision, best left in the context of this complex legislation" to the Maine legislature. It is not apparent to me that the $100 threshold is "wholly without rationality." Instead, the threshold is substantially related to Maine's compelling interest in informing voters and narrowly tailored to avoid unnecessary impositions on associational rights.[85]

## CONCLUSION[86]

For the reasons stated, I conclude that summary judgment should be entered for the defendants and against the plaintiffs.

**SO ORDERED.**

**DATED THIS 18TH DAY OF FEBRUARY, 2011**

/s/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[85] Nat'l Org. for Marriage v. McKee, 666 F. Supp. 2d 193, 212-13 (D. Me. 2009) (citations omitted). Thus, as I said earlier in text, Maine's statute is unlike the statute struck down in Sampson, which applied to every $20 contribution after a $200 threshold was reached. See Sampson v. Buescher, 625 F.3d 1247, 1249 (10th Cir. 2010).

In denying the TRO, I said that "the plaintiffs have not made a colorable claim that their First Amendment rights of free association are threatened by harassment that might follow disclosure." Nat'l Org. for Marriage, 666 F. Supp. 2d at 206 n.74. Now at summary judgment but only in their Reply Memorandum, they argue that technological developments making disclosure records easily searchable and capable of being combined with other identifying information "increase[] the potential for harassment, including 'economic or official retaliation [or] social ostracism,' that disclosure can bring." Pls.' Reply at 15-17 (citation omitted). That still is not enough.

[86] To the extent that the plaintiffs challenge the use of the verb "influence," see Pls.' Reply at 10-11, the concerns that troubled me in the bench trial decision, Nat'l Org. for Marriage v. McKee, 723 F. Supp. 2d 245, 260-61 (D. Me. 2010), are inapplicable here. There the concern was that the term "influence" in the context of candidate elections was vague and would unconstitutionally mix express advocacy for the election or defeat of a candidate with issue advocacy. Id. For state ballot question committees, however, only issue advocacy is involved, and there is no vagueness. Moreover, the Commission has interpreted the term to mean "communications and activities which expressly advocate for or against a ballot question or which clearly identify a ballot question by apparent and unambiguous reference and are susceptible of no reasonable interpretation other than to promote or oppose the ballot question." GUIDANCE ON REPORTING, supra note 20.